2022 PA Super 177

| | | |
|---|---|---|
| DENISE L. WILSON | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KYRA S. SMYERS | : | |
| | : | |
| Appellant | : | No. 128 WDA 2022 |

Appeal from the Order Entered January 10, 2022,
in the Court of Common Pleas of Bedford County,
Civil Division at No(s):  797 for the year 2017.

BEFORE:  BOWES, J., KUNSELMAN, J., and SULLIVAN, J.

OPINION BY KUNSELMAN, J.:                    **FILED:  October 14, 2022**

Kyra S. Smyers (Mother) appeals the order issued by the Bedford County Court of Common Pleas, which expanded the custody rights of Denise L. Wilson (Grandmother[1]) regarding Mother's five-year-old son, L.H.S. (the Child).  Under a previous consent order, Grandmother exercised supervised physical custody for an hour and a half, every other week, in Mother's home. This matter involves the parties' cross-modification petitions. Grandmother sought unsupervised partial custody under 23 Pa.C.S.A. § 5325(1); in response, Mother sought to "suspend" Grandmother's custody, stopping the visits altogether.  The trial court granted Grandmother's relief, awarding her partial custody on the first Saturday of each month.  On appeal, Mother argues

_____

[1] Denise Wilson is the paternal grandmother.

that the court misapplied 23 Pa.C.S.A. § 5328(c)(1) (considerations when awarding grandparent custody). After careful review, we affirm.

In its opinion filed pursuant to Pa.R.A.P. 1925(a), the trial court provided the relevant factual and procedural history:

> Mother and George Bango, Jr. (Father) began a relationship when Mother was 19 years old, and Father was 32 years old, while they both worked at [a local hospital]. Mother was employed in the housekeeping department while Father was an emergency room nurse. Father was an Army veteran and suffered from mental health issues. Mother's parents did not approve of the relationship. Mother hid the relationship, and ultimately six months of her pregnancy, from her parents. As the relationship progressed, Father became more controlling and obsessive with Mother. Father's mental health problems spiraled and ultimately he ended his own life [in December 2016, when the Child was approximately 5 months old].
>
> […] Grandmother initially filed a Complaint for Grandparent's Custody on August 18, 2017. In her initial Petition, Grandmother requested periods of partial custody pursuant to 23 Pa.C.S.A. § 5325(1).[2] [A] hearing on the matter was ultimately scheduled for May 24, 2018, at which

_____

[2] Section 5325(1) (Standing for partial physical custody and supervised physical custody) provides:

> In addition to situations set forth in section 5324 (relating to standing for any form of physical custody or legal custody), grandparents and great-grandparents may file an action under this chapter for partial physical custody or supervised physical custody in the following situations:
>
> > (1) where the parent of the child is deceased, a parent or grandparent of the deceased parent may file an action under this section;

23 Pa.C.S.A. § 5325(1).

point the parties agreed to an order granting Grandmother periods of supervised partial custody every other Friday from 5:00 p.m. to 6:30 p.m., to be supervised by Mother and to occur in Mother's home, as well as several collateral provisions. These supervised periods of partial custody were faithfully exercised by Grandmother for approximately two years until the COVID-19 pandemic. The parties agreed to suspend the in-person periods of partial custody in March/April 2020 and instead Grandmother would telephone the Child. Grandmother made repeated requests to resume some form of in-person contact with the Child, which [were] denied by Mother.

Ultimately, Grandmother filed a Petition to Modify the Custody Order on July 29, 2021, which gave rise to the instant litigation and appeal. In her Petition to Modify, Grandmother requested that the visits resume and not be supervised, arguing that supervision was no longer necessary since a relationship and bond had developed between Grandmother and the Child such that those provisions were no longer necessary. Thereafter, on September 22, 2021, Mother filed a Petition for Modification of Custody, requesting that Grandmother's periods of partial custody be suspended, alleging that the Child and Grandmother failed to develop a bond and that the Child identifies Mother's fiancé as his father and [the fiancé's] parents as [the Child's paternal] grandparents.

Following hearings held on November 12, 2021, and January 3, 2022, [the trial court] granted Grandmother's Petition for Modification of Custody and by Order dated January 2, 2022, granted Grandmother unsupervised partial custody on the first Saturday of each month from 10:00 a.m. until 5:00 p.m., as well as several collateral provisions.

Trial Court Opinion (T.C.O.), 2/11/22, at 1-3 (capitalization and format adjusted) (footnote added).

Mother timely filed this appeal. She presents three issues for our review, which we reorder for ease of disposition:

1. Did the trial court commit an error of law or an abuse of discretion when it precluded [Mother] from offering more detailed testimony of the circumstances surrounding the [Father's] conduct towards [Mother] and her family, culminating in the [Father] taking his own life (suicide), and those circumstances' effects upon Mother and her extended family?

2. Did the trial court commit an error of law or an abuse of discretion when, under the circumstances of the present matter, it ordered an expansion of [Grandmother's] physical custody rights to partial custody, notwithstanding the lack of any appreciable relationship between her and the [Child]?

3. Did the trial court commit an error of law or an abuse of discretion when, under the circumstances of the present matter, it overrode [Mother's] decision (or denied her request) to terminate continuing contact between the [Child] and [Grandmother], unnecessarily and/or improperly overriding a fit parent's decision and giving insufficient weight to the parent-child relationship, by ordering an expansion of custodial contact afforded [to] the [Grandmother] to partial custody?

Mother's Brief at 7-8.

Mother's first appellate issue concerns the admission of evidence. Citing her unhealthy relationship with Father and the circumstances of his death, Mother argued at trial that any involvement with the paternal family would adversely affect her mental health and, by proxy, her ability to parent. To support this argument, Mother sought to introduce her own testimony, as well as that of her family members. According to Mother, "[s]uch testimony would have provided significant context as to why [Mother] decided it was better to end an unproductive, unsubstantial relationship between [Grandmother] and the Child." *Id.* at 32. The trial court permitted some of Mother's testimony

but found Mother's additional, proffered evidence to be irrelevant or superfluous. Mother alleges the court erred.

To resolve this issue, we are guided by the following principles. The admission of evidence is a matter vested within the sound discretion of the trial court, and such a decision shall be reversed only upon a showing that the trial court abused its discretion. *Commonwealth v. Antidormi*, 84 A.3d 736, 749 (Pa. Super. 2014). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Id.* (citation omitted).

The threshold inquiry with admission of evidence is whether the evidence is relevant. *Id.* at 750 (citation omitted).

> Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding the existence of a material fact. In addition, evidence is only admissible where the probative value of the evidence outweighs its prejudicial impact.

*Id.*; *see also* Pa.R.E. 401; 402; 403.

In its Rule 1925(a) opinion, the trial court summarized Mother's testimony:

> The court heard a substantial amount of testimony about the relationship between the parents prior to Father's suicide. It was obvious to this court that the parents' relationship was not a very good one due in large part to [Father's] serious mental health struggles. Mother testified

that she and Father never lived together. As the relationship progressed, he became more possessive and was obsessed with her. Mother testified that in approximately May 2016, Father was acting erratically, which culminated in a stand-off with the Pennsylvania State Police. Father had a firearm and attempted to kill himself but was taken into custody and incarcerated. Mother testified credibly that this was a terrifying time for her and her family. Father was released from jail in approximately September 2016. After being released, Father sent Mother a few emails. Father filed a custody petition, and a custody conference was held in October 2016. A custody hearing was scheduled for March 2017. Mother acknowledged sending Father messages expressing love, but Mother testified that she only did so because she didn't want him to hurt himself. Ultimately, Mother filed for a Protection From Abuse Order on December 28, 2016. Father committed suicide on December 29, 2016, after being served with the temporary order. While acknowledging the certain and unfortunate effect the above events had on Mother, this court noted that the deceased Father is not a party to this action and there is no evidence whatsoever that Grandmother engaged in any abusive acts. Rather, the evidence has shown that Grandmother has acted with good faith throughout this custody case.[3]

T.C.O. at 10-11 (capitalization adjusted) (footnote added).

The trial court explained that it initially allowed significant testimony about Father's actions and their impact on Mother, but that the court prohibited collateral testimony after doubting its relevance, "especially since Grandmother had no role in those events or the parents' relationship." *See id.* at 20. Mother concedes the trial court allowed her to provide information about the traumatic impact Father's death had on her. However, she

_____

[3] The trial court also noted: "Grandmother credibly testified that she did not blame Father's suicide on Mother, testifying that it happened because [Father] had mental health problems." T.C.O. at 9.

- 6 -

maintains that the court erred when it prevented her from elaborating why she should be allowed to end the relationship between Grandmother and the Child. *See* Mother's Brief at 32.

After review, we discern no abuse of discretion. The trial court allowed Mother to make her case, affording her ample opportunity to present supporting testimony. The court even found Mother to be credible, expressly noting that Mother became physically emotional during her testimony. *See* N.T., 1/3/22 (Day 2), at 81. But after a certain point, the court decided that *additional* testimony regarding Mother's history with Father, and how it currently affects her, was superfluous and not particularly relevant to either Mother's relationship with the Child, nor the Child's relationship with Grandmother. We conclude that the court's evidentiary ruling was not manifestly unreasonable, and we decline to remand for further testimony.[4] Mother's first issue is without merit.

The crux of Mother's appeal concerns the trial court's substantive custody award. We begin our analysis of her remaining issues by observing this Court's scope and standard of review for custody matters:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual

---

[4] The procedural disposition of this case is also pertinent to our decision. Here, Grandmother sought a modest adjustment of her custody time. Moreover, Mother only sought to end Grandmother's contact with the Child in response to Grandmother's modification petition. Notably, the trial court recognized that traumatic event occurred nearly six years ago, and the Grandparent-Child relationship has existed for years without any real issue.

determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*S.T. v. R.W.*, 192 A.3d 1155, 1160 (Pa. Super. 2018) (citation omitted).

The Child Custody Act provides grandparents with the ability to seek partial custody in certain situations, including when a parent of the child is deceased. *See* 23 Pa.C.S.A. § 5325(1). Underpinning the statute is the state's interest in protecting the health and emotional welfare of children, which includes ensuring that children are not deprived of beneficial relationships with their grandparents. *See Hiller v. Fausey*, 904 A.2d 875, 886 (Pa. 2006); *see also D.P. v. G.J.P.*, 146 A.3d 204, 211 (Pa. 2016).

"The stated goal [of fostering the grandparent-child relationship] is not insignificant. In the event of a major disruption to the family environment, such as where there is parental abuse, neglect, substance abuse, mental illness, or abandonment, the interest may be especially pronounced." *D.P.*, 146 A.3d at 214 (citation omitted). Our courts have recognized that the state's interest extends to situations where a parent has died:

> While the Pennsylvania Supreme Court recognized that a grandparent's desire for partial physical custody would not prevail over a fit parent's decision to limit contact in all cases, it refused "to close our minds to the possibility that in some instances a court may overturn even the decision of a fit parent to exclude a grandparent from a grandchild's life, ***especially where the grandparent's child is***

- 8 -

> ***deceased and the grandparent relationship is longstanding and significant to the grandchild.***"

***J. & S.O. v. C.H.***, 206 A.3d 1171, 1176 (Pa. Super. 2019) *appeal denied*, 654 Pa. 517 (Pa. 2019) (quoting ***Hiller***, 904 A.2d at 887) (emphasis original). The High Court has also emphasized "the many potential benefits of strong inter-generational ties" as another reason to foster the grandparent-child relationship. ***See Hiller***, 904 at 886 (citing ***Troxel v. Granville***, 530 U.S. 57, 64 (2000)).

Of course, the state's interest in protecting the grandparent-child relationships comes with a cost – namely, the infringement of a parent's rights. ***See Hiller***, 904 A.2d at 886. "There is no dispute that Section 5325 burdens the rights of parents to make decisions concerning the care, custody, and control of their children; that such right is a fundamental one; and that, as such, it is protected by the Fourteenth Amendment's due process and equal-protection guarantees." ***D.P.***, 146 A.3d at 210 (citations omitted); ***see also Troxel***; ***and see*** U.S. CONST. amend. XIV, § 1.

Instantly, Mother acknowledges Grandmother has standing to pursue partial custody under 23 Pa.C.S.A. § 5325(1). She does not allege any procedural violation, nor does she challenge the validity of that subsection, which was reaffirmed as recently as 2019. ***See J. & S.O.***, ***supra***. Instead, Mother claims the trial court impermissibly infringed on her fundamental custody right, by misapplying one of the relevant factor analyses prescribed by the Child Custody Act. ***See*** 23 Pa.C.S.A. § 5328(a), (c).

- 9 -

The Child Custody Act mandates two separate analyses when a grandparent seeks partial custody. First, "[i]n ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including [factors 1 through 16.]" 23 Pa.C.S.A. § 5328(a)(1)-(16).[5] Second, for grandparents, the Child Custody Act further mandates the consideration of supplemental criteria under Section 5328(c)(1)(i)-(iii), in addition to the factors itemized under Section 5328(a). **_D.R.L. v. K.L.C._**, 216 A.3d 276, 280 (Pa. Super. 2019).

Mother's second and third appellate issues concern the trial court's findings under Section 5328(c)(1)(i) and (ii), respectively.

Section 5328(c)(1) provides, in relevant part:

> (1) In ordering partial physical custody or supervised physical custody to a party who has standing under section 5325(1) or (2) (relating to standing for partial physical custody and supervised physical custody), the court shall consider the following:
>
>> (i) the amount of personal contact between the child and the party prior to the filing of the action;
>>
>> (ii) whether the award interferes with any parent-child relationship;
>
> [...]

---

[5] We have held that a Section 5328(a) analysis is also necessary when – as was the case here – a party seeks to modify the **type** of custody award. **_See A.V. v. S.T._**, 87 A.3d 818, 824 n.4 (Pa. Super. 2014); **_see also_** 23 Pa.C.S.A. § 5323(a) ("Award of custody"). Grandmother sought to modify the type of custody award, from supervised physical custody to partial physical custody.

- 10 -

23 Pa.C.S.A. § 5328(c)(1)(i)-(ii).

In her second appellate issue, Mother argues the trial court ignored "the utter lack of substance to the relationship" between Grandmother and the Child when considering Section 5328(c)(1)(i). **See** Mother's Brief at 23. She concludes that the custody award was erroneous, because it "was imposed in the absence of a substantive, caring and nurturing relationship upon which [the Child] relies and derives emotional value." **Id.**

For support, she cites **Hiller**, **supra.** In that case, a maternal grandmother sought partial custody after the mother's death from cancer. Prior to the mother's death, the child had frequent contact with the grandmother, especially during the last two years of the mother's illness, when they saw each other almost daily. The grandmother was an active part in the daily routine and took on the task of preparing the child for the mother's death. And given their close relationship, the trial court determined that the grandmother should be entitled to partial physical custody. **Hiller**, 904 A.2d at 877.

**Hiller** concerned the constitutionality of the prior version of Section 5325, which authorized grandparents to seek partial custody in the event of a parent's death. Ultimately, our Supreme Court acknowledged the state's interest in fostering the grandparent-child relationship and upheld the statute authorizing grandparent custody upon a parent's death. **Id.** But Mother does not rely on **Hiller** for its holding, per se; instead, she relies on facts of **Hiller** to illustrate what, in her view, constitutes the requisite amount of personal

contact before a court may award a grandparent custody under Section 5328(c)(1)(i).  Mother distinguishes the instant case from the facts of **Hiller** to argue that the subject Child and Grandmother had a much more attenuated relationship.  Mother concludes that, unlike the relationship in **Hiller**, the amount of personal contact between Grandmother and the Child does not warrant a partial custody award.

First, we do not construe **Hiller** – as Mother does – to be the yardstick by which a court measures the amount of grandparent-child contact before determining whether a partial custody award is deserved.  That consideration is codified by Section 5328(c)(1)(i), which the trial court must weigh in conjunction with the other relevant factors.  Second, although we recognize the factual distinctions from **Hiller**, the record in this matter does not support Mother's allegation that the partial custody award was unfounded due to the lack of personal contact between Grandmother and the Child.

In its consideration of the amount of personal contact between Grandmother and the Child, the trial court made the following findings:

- [T]he testimony was clear that Grandmother did not have a relationship with the Child prior to Father's suicide on December 29, 2016.  However, it appeared that Grandmother desired to develop a relationship with the baby, as evidenced by a letter sent to Mother on or about August 1, 2016.

- Of relevance to this court was the fact that at the hearing [in May 2018], Mother **agreed** to entry of a consent order granting Grandmother supervised partial custody every other Friday evening.  By her agreement, Mother allowed a relationship to begin between Grandmother and the Child, beginning in

- 12 -

> June 2018 when the Child was approximately two years old. Mother testified that she agreed to the above arrangement because she felt compassion for Grandmother and wanted to make things work. Approximately 40 of these supervised visits occurred as scheduled for almost two years until approximately March/April 2020.
>
> • Grandmother testified that while the supervised visits were enjoyable, that having them occur where Mother lived with the Maternal Grandparents and [Mother's minor siblings], was awkward and tense. Grandmother felt like she was intruding into their home. Grandmother testified that she referred to herself as "Nana" and the Child also called her "Nana," and that when told "I love you," the Child would respond "I love you too." Mother acknowledged that she had heard the Child refer to [Grandmother] as "Nana" but further testified that the Child typically did not refer to [Grandmother] at all during visits or if he did, he called her "Denise."
>
> • Grandmother entered as evidence several photographs of the Child taken during the early visits. This court noted that the pictures depict a happy, smiling Child that appeared to be enjoying his interactions with Grandmother.
>
> • In March/April 2020, due to the uncertainty surrounding the COVID-19 pandemic, the parties agreed to stop the in-person visits and instead have telephone calls. […] However, the court was satisfied to resume visits and allow unsupervised contact while in a public location to occur near Mother's home as a way to slowly transition to Grandmother resuming regular contact with the Child. […] By all accounts, the several "unsupervised" [] visits went well.

**See generally** T.C.O. at 6-8 (emphasis original).

The trial court was primarily persuaded by the fact that Mother allowed Grandmother to begin a relationship three years ago, when the Child was a toddler. Whether Mother was motivated by guilt, or sympathy, or out of a

- 13 -

genuine concern for the Child's best interests, she allowed Grandmother to become a part of the Child's life. Indeed, Grandmother has consistently maintained this relationship since. Although Mother's opposition to Grandmother's custody appears to be made in good faith, we find her appellate argument on this point to be somewhat disingenuous. Mother cannot expect the trial court to ignore the relationship that Mother herself permitted to blossom. Nor can Mother expect this Court to ignore the trial court's subsequent findings.

When considering the trial court's findings in light of the record, we discern no abuse of discretion. The court thoroughly considered the amount of personal contact between the Child and Grandmother prior to the commencement of the modification action. Importantly, we observe that the trial court awarded Grandmother partial custody for only seven hours each month, on the first Saturday. To be sure, the partial physical custody award is an expansion of Grandmother's custody (and thus necessarily an infringement upon Mother's custody). But the award is not out of proportion with the amount of personal contact between Grandmother and the Child, prior to Grandmother's modification petition. Put another way, the court's conclusions under Section 5328(c)(1)(i) are not manifestly unreasonable in light of the sustainable findings. *See S.T.*, 192 A.3d at 1160. For these reasons, Mother's second appellate issue is without merit.

In her final appellate issue, Mother argues the custody award "interferes with the parent-child relationship," in contravention of Section 5328(c)(1)(ii).

*See generally* Mother's Brief at 26-30. "We have emphasized that the burden is on the grandparents to demonstrate that partial custody or [supervised physical custody] in their favor is in the child's best interest and will not interfere with the parent-child relationship." ***D.R.L.***, 216 A.3d at 279 (citation omitted); *see also Hiller*, 904 A.2d at 879.

Mother reasons that Grandmother's involvement would interfere with Mother's desire to begin a new life with Kevin Smith (Fiancé) and his family.[6] To explain, Fiancé has been involved in the Child's life since infancy. The Child believes Fiancé is his father and that Fiancé's parents are his extended paternal family. Mother has decided not to inform the Child about "all of the circumstances pertaining to the Child's Father." ***See*** Mother's Brief at 28. Evidently, it was Mother's intention never to tell the Child about Father or the paternal family – or at least not in the immediate future. According to Mother, the partial custody award interferes with her parental right to decide what to tell the Child and when.

The trial court opined that Mother "wishes to erase the fact that the Child had a biological father and therefore deny [the Child] the opportunity to continue the relationship [with Grandmother.]" ***See*** T.C.O. at 10. The court said it was "gravely concerned about the effect this will have on the Child's emotional health and well-being." ***Id.***

---

[6] The wedding was planned for February 2022.

However, the learned trial court determined that it was still Mother's decision how much to divulge to the Child and when to do so. At the conclusion of the hearing, the court spoke directly to Mother:

> [Mother's] been forthright with the court today which I appreciate as to her feelings on the matter. And it would seem to me with everything she's been th[r]ough, she's earned that right to be able to tell [the Child] what she thinks is appropriate. I would just, while it is your decision, ma'am, I would just very, very strongly encourage you to give it serious consideration moving forward when you're deciding what to tell him, if anything, because in my experiences these things, these secrets, they don't remain secrets. And it would seem to me the most important person in [the Child's] life, or people I should say, are his Mother and [Fiancé.] And I would just ask you to consider how [the Child] will feel at some point, and it's not if, it's probably a matter of when he finds out that [Fiancé] is not his biological father. How will it impact [the Child] when he finds out that the two most important people in his life essentially lied to him? My experience in handling these cases is the older a child gets when he's told, if secrets are kept, it has a devastating impact.
>
> But, ma'am, I can't make that decision for you. You're his mother. You need to make that decision. But I would just encourage you to just give it some real thought. Certainly [the Child] is not at an age to where it would be appropriate to tell him, I guess what we'll call the full story. Certainly that would not be in his best interest. But it would seem to me an age appropriate factual, age-appropriate conversation at least rooted in facts telling him that his biological father was ill and he died, but that he has [Fiancé] and [Fiancé's] been in his life, that he loves him and he wants to be his dad. But, again, that's not my job here today, ma'am. I would just ask you to consider it.

N.T. (Day 2) at 92-94.

- 16 -

The court also acknowledged that Grandmother has respected Mother's wishes thus far and cautioned Grandmother to continue to do so:

> The other thing, [Grandmother], it seems to me as though you've been overall pretty respectful of the wishes of [Mother] as far as what's told to the Child. I'm not going to specifically put it in the court order what you're allowed to talk to him about, but I really don't see where it would be in his best interests to have some of these things told to him by anybody other than his Mother. So, my point, ma'am, is I would expect you to continue to support her and be respectful of however she presents this situation to the Child. And I know you may not agree with that, but we've got to look at what's in the Child's best interest.

*Id.* at 95-96.

Even though the trial court ruled that Mother retained the exclusive right of whether, and how much, to share with the Child about his Father, Mother maintains that the partial custody award still interferes with the parent-child relationship.

For support, Mother relies on *D.R.L.*, *supra*. There, the trial court found that the grandparents' request for more partial custody would interfere with the mother's and the adoptive father's relationship with the child. *D.R.L.*, 216 A.3d at 285-86. Under our deferential abuse of discretion standard, we had to affirm:

> In sum, we interpret the crux of [the] paternal grandparents' claims as disputes with the trial court's findings of fact and determinations regarding credibility and weight of the evidence. [The] paternal grandparents essentially ask this court to re-find facts, re-weigh evidence, and re-assess credibility. That is not our role. As evidence by the trial court's opinion, the trial court performed a detailed and thorough analysis of the child's best interest.

> The trial court's findings and determinations are supported by competence evidence in the record and we will not disturb them. Accordingly, we conclude that the trial court did not abuse its discretion by declining to expand the paternal grandparents' custodial periods with the child.

*Id.* (internal citation omitted) (capitalization adjusted).

Mother's reliance upon **D.R.L.** is misplaced, because she fails to appreciate how her case differs from the procedural disposition of **D.R.L.** Here, the trial court found that an expansion of Grandmother's custody would *not* interfere with the parent-child relationship. We must follow the same deferential standard of review, which means that we do not "re-find facts, re-weigh evidence, and re-assess credibility." **Id.**

Applying our deferential standard, we conclude the trial court's findings are supported by competent evidence. The court heard testimony that Grandmother has deferred to Mother's wishes regarding the involvement of the paternal family. Moreover, Grandmother has promoted the parent-child relationship and has been supportive of Fiancé. The court opined:

> The court heard testimony that Grandmother complied with Mother's wishes to keep the Child's biological Father a secret. Mother apparently has told the Child that Grandmother is just a "family friend." While Grandmother disagrees with this, she has followed Mother's wishes. Furthermore, Grandmother testified that she would be in favor of [Fiancé] adopting the Child, so that the Child would have all the benefits afforded by an intact family unit. However, Grandmother felt that the Child should also be able to have a relationship with the paternal side of his family, including his teenage half-sister[.] Despite disagreeing with Mother on this issue, Grandmother has followed Mother's wishes. There was no evidence that Grandmother has not supported the parental relationship

> between the Mother and the Child. In her testimony, Grandmother was complementary of Mother and Fiancé. Grandmother credibly testified that she was never critical of Mother, Fiancé, or the maternal grandparents and never said or did anything during visits to undermine Mother's position of importance in the Child's life. Grandmother credibly testified that she did not blame Father's suicide on Mother, testifying that it happened because he had mental health problems.

T.C.O. at 8-9 (capitalization adjusted).

Perhaps we would have concern if the trial court gave Grandmother *carte blanche* to tell the Child the unvarnished truth, without regard to Mother's careful consideration about how best to inform the Child. Had the court done so, then we could envision how its award might run the risk of parental interference under Section 5328(c)(1)(ii). But that is not what occurred here. The trial court utilized a deft touch, reserving for Mother the right to inform the Child about his parentage, while imploring the parties to appreciate the "minefield" created by withholding the truth. **See** N.T. (Day 2) at 97. Given the court's decision, Mother's argument – that a partial custody award interferes with her ability to create a new family unit with Fiancé – fails on its own terms: Grandmother is supportive of Mother; Grandmother has abided by Mother's wishes about what is told to the Child; and Grandmother is in favor of Fiancé adopting the Child.

Briefly, we dispose of Mother's ancillary arguments regarding the trial court's application of Section 5328(c)(1)(ii). Mother wished that Grandmother refer to herself as "a close family friend" and not "Nana." After some deliberation, the court allowed Grandmother to refer to herself as "Nana." **Id.**

at 97-99.  We discern no error or abuse of discretion.  First, as we discussed in detail above, the state has an interest in fostering the grandparent-child relationship.  The Legislature has codified that interest in the Child Custody Act, which explicitly refers to grandparents.  It might lead to an absurd[7] result if a grandparent, who obtained an award under a grandparent custody statute, could not self-identify as the grandparent.  Second, the testimony reveals that the Child already refers to Grandmother as "Nana," at least some of the time.

Insofar as Mother alleged that the partial custody award causes parental interference because the award adversely affects her mental health, we conclude this argument merits no relief.  We note that the trial court found credible Mother's testimony that the circumstances of her relationship with Father cause her stress and anxiety.  But the court did not conclude that this emotional toll meant that Grandmother's partial custody award interfered with the parent-child relationship.  The court was not persuaded that a relatively modest expansion of Grandmother's custody would now produce such distress that it would cause parental interference.[8]  Such a determination was within the court's purview.

In sum: the trial court did not error or abuse its discretion when it determined that Mother's additional testimony about her history with Father

---

[7] Courts must not interpret a statute in a manner that leads to an absurd result.  **See, e.g.**, **C.B. v. J.B.**, 65 A.3d 946, 953 (Pa. Super. 2013).

[8] The trial court also encouraged Mother to consider Grandmother's proposal that the parties seek some type of counseling.  Evidently aware that these professional services can be costly, the court stopped short of including it in the custody order.

was irrelevant; the court did not abuse its discretion when it determined that Grandmother and the Child had a prior, beneficial relationship under Section 5328(c)(1)(i); and the court's award would not result in parental interference under Section 5328(c)(1)(ii), as Mother retained the right to determine how best to reveal to the Child the truth about his parentage. Apart from these holdings, we echo the thoughtful remarks delivered by the trial court. We sympathize with the trauma the parties have endured, applaud their endeavor to be respectful toward each other, and encourage them to continue being mindful of the Child's best interests.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/14/2022

- 21 -