J-A04020-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| DANIEL VALENZUELA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| MARILYN AGUILAR | : | |
| | : | |
| Appellant | : | No. 1248 MDA 2024 |

Appeal from the Order Entered August 1, 2024
In the Court of Common Pleas of Luzerne County Civil Division at No(s):
201912417

BEFORE:  LAZARUS, P.J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED: APRIL 17, 2025**

Appellant Marilyn Aguilar (Mother) appeals from a final custody order granting Appellee Daniel Valenzuela (Father) primary physical custody and Mother partial physical custody of their minor children, Da.V. (Son) and De.V. (Daughter) (collectively, Children).  Mother claims that the trial court erred or abused its discretion in how it applied the statutory custody factors to award custody.  We affirm.

By way of background, Son was thirteen to fourteen years old and Daughter was twelve years old at the time of hearing on this matter.  Mother and Father cohabited for approximately nine years until June of 2018.  *See* N.T., 7/15/24, at 94-95.  On or about September 10, 2019, Mother filed a Protection From Abuse (PFA) petition against Father.  *See id.* at 111.  On September 24, 2019, Father agreed, without admission of wrongdoing, to entry of a one-year PFA order against him, which included temporary custody

provisions regarding Children. *Id.* at 69, 111; Ex. D-7 (PFA order, 9/24/19). Father subsequently filed a custody petition for Children and the parties agreed to a custody order entered on December 2, 2019, that established a shared physical custody schedule wherein Mother had Children on Thursdays and Fridays, and providing that the non-custodial parent "may exercise reasonable unmonitored telephone contact . . . with [Children, and Children] may also initiate telephone contact with the [parent] not then in physical custody of them." *See* Trial Ct. Order, 12/2/19, at 1-2.[1]

On May 3, 2023, Father filed the instant petition to modify, seeking primary physical custody and alleging that Mother "failed to ensure [Children's] attendance at extra-curricular activities[]" and was "often late for custodial transfers and fail[ed] to communicate with Father regarding the same[.]" Father's Pet. Modify Custody, 5/3/23, at 2 (unpaginated). On September 13, 2023, Father filed a petition for contempt and special relief, alleging that Mother had "failed to ensure [Children] are attending school during her custodial time and completing homework, resulting in truancy actions and delays in [Children's] educational and social development." Father's Pet. Spec. Relief, 9/13/23, at 2 (unpaginated). Upon receipt of this petition, the trial court entered an interim order that modified the parties'

_____

[1] We note that the December 2, 2019 custody order superseded the custody provisions of the September 24, 2019 PFA order. *See* Pa.R.C.P. 1901.7(d) ("[a]ny valid custody order entered after the final [PFA] order supersedes the custody provisions in . . . the [PFA] order").

custody schedule, granting Father physical custody on all school days therein, and scheduled a hearing on this petition. **See** Trial Ct. Order, 9/13/23.[2]

On September 18, 2023, after a hearing on Father's petition for contempt and special relief the trial court entered an interim order granting Father custody on all school days and Mother custody on Saturdays. **See** Trial Ct. Order, 9/18/23.[3]

The trial court held hearings on Father's petition to modify on March 14, 2024 and July 15, 2024, and took testimony from Father; Mother; G.G., Father's mother; A.P., Father's fiancée; and R.C., Mother's friend.

G.G. testified that she resided in Hanover Township and that Children stay at her home after school on Mondays through Fridays. **See** N.T., 3/14/24, at 6. Father's sister resides with G.G. and is at home when Children

---

[2] We note that under the Child Custody Act, pursuant to its powers in special relief, a "trial court may modify custody temporarily under appropriate circumstances when it is in the best interest of the child to do so[,]" and may do so without first holding a hearing and without considering the custody factors set forth in 23 Pa.C.S. 5328(a). **E.B. v. D.B.**, 209 A.3d 451, 460, 463 (Pa. Super. 2019) (citation omitted); **see also** 23 Pa.C.S. § 5323(b); Pa.R.C.P. 1915.13. That is, a trial court may grant special relief that modifies custody when it is reasonable and necessary to protect the best interest of the child under emergency circumstances, however such relief should be temporary in nature; otherwise, the trial court must hold a hearing and consider the Section 5328 custody factors before modifying custody. **See** **E.B.**, 209 A.3d at 463 (citation omitted), 460.

[3] The order of September 18, 2023 states that it was issued in response to Father's "Petition for Contempt" but also states that "Father's Petition for Contempt against Mother is held in ABEYANCE." Trial Ct. Order, 9/18/23. Therefore, the trial court orders of September 13, 2023, and September 18, 2023 both appear to address Father's request for special relief only.

are dropped off by the school bus, and G.G. arrives home at 4:00 p.m. *Id.* at 12-13, 15.

A.P. testified that she is engaged to Father and has resided in Scranton with Father and Children for about four and a half years. *See* N.T., 7/15/24, at 5-7, 15. She explained that Children attended school in Hanover and had attended this school "their entire life[,]" that Son "plays football and does track[,]" and Daughter "does softball and field hockey[.]" *Id.* at 7. She transports Children to school in the morning and after school Children stay with Father's parents until they are picked up by Father or herself. *Id.* at 19-20. She testified that Children's school had filed truancy actions due to Children's "absences and tardiness" during Mother's custodial times, which at that time were Thursdays and Fridays, and that Mother was often late to pick up and drop off Children, "probably 80 percent of the time." *Id.* at 12, 18-20, 28. A.P. testified that in 2020 Father had pled guilty to disorderly conduct for an incident during an annual parade in which he had been drinking and got into a fight. *Id.* at 20-21. With regard to Father's criminal convictions, she testified that Father has "learned from his mistakes[,]" that these prior incidents occurred when "he was under the influence of alcohol[,]" that he has "grown from this[,]" and that Father would not act the same way now. *Id.* at 28-29.

Father testified that he resides in Scranton with Children and his fiancée, A.P. *Id.* at 30. Father explained that Children attend school in the Hanover School District even though they do not reside in that school district and that

- 4 -

the school district was aware of where Children actually reside. *Id.* With regard to his criminal convictions related to alcohol consumption, Father testified that these incidents occurred when he was younger and that he has since reduced his alcohol consumption and does not go out much anymore. *Id.* at 31. Father testified that his parents and his sister live in the area and have loving relationships with Children, and that his fiancée has "an amazing relationship" with Children. *Id.* at 32-33.

Father testified that when the parties had shared physical custody, "[s]ometimes I would text [Mother] about anything to do with the kids, and usually I don't get a response. I don't get a response. Sometimes I get a message back from the system that I've been blocked from her number, or I'll get a response hours later or days later." *Id.* at 33-34.[4]

Father testified that around May or June 2024, while Children were in Mother's care, "I couldn't get in contact with their phones through text

_____

[4] Father's text message evidence spanned a period of time from November 2023 to March 2024. *See id.* at 34-42; Ex. P-1 to P-14 (text messages). This evidence included text message conversations in which Father messaged Mother about Children over a period of nine days, from November 10, 2023 to November 19, 2023, asking Mother questions such as, "How long until you get here?" and informing Mother that "[Son] has Friendsgiving Dinner at the high school at 2 p.m. Players were asked to bring a side dish, so if you can get a pumpkin pie from Sam's Club[]" and "since [we] never got a response from you about anything, so we'll drop [Children] off Thursday at 8 p.m.?" and receiving no text message response from Mother. *Id.* at 35-36; Ex. P-1. Father's evidence also included text message conversations between the parties about Children over a period of eighteen days, from February 4, 2024 to March 1, 2024, where Mother does not respond by text to any of Father's text messages. *Id.* at 41; Ex. P-10 to P-13.

message or anything. It seemed like maybe their phones were turned off. Then I tried calling [Mother], but the calls kept going to – I think it would say the phone was turned off or something. . . it just wasn't going through." *Id.* at 37; *see also* Ex. P-2, P-11.[5] Father testified that Mother took Children's phones away on the advice of her lawyer and that, due to Mother's frequent lapses in communication with Father, it was difficult to keep track of Children when they were in Mother's care. *Id.* at 63.

The trial court admitted evidence that Mother had her driver's license suspended from April 3, 2024 to June 12, 2024, and Father testified that he had observed Mother driving Children while her license was suspended. *Id.* at 42-43, 55-56; Ex. P-15 (Domestic Relations docket sheet).[6]

Father testified that he petitioned for special relief due in part to Son's school attendance while in Mother's care. *Id.* at 51-52. Father explained that Son's school day starts at 7:30 a.m. while Daughter's school day started at a later time, and that

> the days [Mother] had them that she took them to school, which was Thursday and Friday, [Son] would be late almost every single time. And it wasn't just, like, five minutes late here and there. It was thirty minutes late, sometimes an hour, twenty minutes. It

---

[5] Father's evidence included this text message to Mother on November 23, 2023: "Is there any reason why I can't get in contact with my kids? I'm trying to call you and it seems like you have me blocked[,]" and on February 8, 2024: "Hey I need the kids phones they are turned off but I need them to turn them on where can we meet so I can set them up." *Id.* at 37; Ex. P-2, P-11 (text messages).

[6] Father testified that he obtained this evidence about Mother's suspended license from his online child support account. *Id.* at 43-44.

was consistently every – I think that year he had, I want to say, seventeen lates. And I think he had maybe nine un-excused absences.

*Id.* at 51, 71. Father went on to explain that, before being awarded primary custody, "every Sunday night we would have to catch up with their [school]work so they could get graded[,]" as this schoolwork did not get done during Mother's custodial times. *Id.* at 52.

After obtaining primary custody, however, Father testified that Children have been "doing school[work] Monday through Thursday, and then the weekend they had to themselves because their school[work] was done." *Id.* Father reported that since the change in custody Children have not had any instances of unexcused absences or tardiness, their grades have improved from honors level to high honors, and they now consistently attend their extracurricular athletic activities. *Id.* at 52-53. Father testified that Mother attended two of Daughter's approximately fifteen softball games during the past season, and that Mother's attendance at these games coincided with her custodial pick-up time, whereas Father attended "every game[,]" and that Mother's attendance of Son's practices and games was similar to her attendance of Daughter's activities. *Id.* at 54-55. Father explained that he has stopped asking Mother about why she does not attend more of Children's games because "[s]he would say it's none of your business or worry about yourself . . . [o]r she would make up an excuse." *Id.* at 55. Father also testified that Mother did not attend Daughter's softball senior ceremony, a special event at the end of Daughter's little league career attended by "[a]ll

the parents, other kids were there[,]" during which Daughter had been "looking into the crowd looking for [Mother,]" and which Son had also not attended as Mother had left the field with Son before Daughter's ceremony. *Id.* at 65.

With regard to Mother's allegations of abuse, Father denied ever abusing Mother and testified that he understood that the PFA order was "an agreement without any acknowledgment of wrongdoing." *Id.* at 69-70, 75-77; *see also* Ex. D-7 (PFA order).[7] Father further testified that "the PFA was a way for [Mother] to get custody of [Children] at the time[,]" that he had not been permitted to see Children "for two weeks during that [temporary] PFA," and that he agreed to entry of a PFA order so that he "could get some type of custody time with [Children]." *Id.* at 77-78.

Mother testified that she resided in a five-bedroom house in Kingston with her six children, aged five months to twenty years old, including Children; and her boyfriend, D.G. *Id.* at 80-83, 94-95. Mother admitted that D.G. has a driving under the influence (DUI) conviction. *Id.* at 107. Mother testified that Children "get along awesome" and "have the most amazing bond ever" with her other children. *Id.* at 86-87.

Mother testified to an incident of abuse by Father that occurred in 2018 after the parties separated, where Father choked Mother. *Id.* at 96. Mother testified that Father physically abused her on numerous other occasions and

---

[7] The PFA order of September 24, 2019, states that it was entered "[b]y agreement without admission."

submitted photographs of Mother's face that Mother stated had been taken in 2017 after Father had abused her. *Id.* at 97-100; Ex. D-13. Mother testified that she filed a PFA petition after an incident on September 10, 2019 in which Father abused Mother after a custody drop-off. *See* N.T., 7/15/24, at 101-02, 109-10. Mother and R.G. both testified that Father had been the sole aggressor in this incident and that Mother did not push or lay hands on Father; R.C. also testified that Mother called police after this incident. *Id.* at 110, 126-34.[8] Mother explained that due to Father's abuse that she is traumatized and does not communicate well with him as he makes her nervous and anxious. *Id.* at 101-02. Mother denied, on cross, after viewing Father's video

---

[8] Mother's testimony regarding her conduct during the incident in September of 2019 is:

> Q: And what happened next?
> A: When he opened the vehicle, he opened the vehicle door, and that's when I got out the car for him to get away. But he grabbed me at that point. He grabbed me against the door in the vehicle. He pinned me in the corner. [R.C.] was my coworker at that time, my friend. She went and she told him to get off of me. And he got off of me, but I think she shoved him at that point. Everything went so fast. I don't remember exactly what she did.
> Q: But you didn't push him?
> A: I did not touch him.

*Id.* at 110; *see also id.* at 133-34 (R.C.'s testimony that she did not see Mother "put her hands on [Father] at any point" and "[Mother] didn't push him" during this incident).

evidence of the incident of September 10, 2019, that she had earlier stated that she had not laid hands on Father during this interaction.  ***Id.*** a 143.[9]

_____

[9] The incident depicted in the video, as described by Father on re-direct, shows that Father had his hand on the door of Mother's vehicle to hold the door open so that he could continue talking to her, and that he "never had [his] hands on Mother" and that he "never touched her."  ***Id.*** at 140-41.  Father also described the parties' conduct, as depicted in the video, as "[Mother] pushing [Father] first before anything[]" and "[Mother] pushing [Father] not once, not twice, not three times, but four times[.]"  ***Id.*** at 139.

After viewing the video, on cross Mother testified as follows:

> Q:  So you testified before that you didn't lay a hand on [Father] at all?
> A:  I didn't.  You never specifically asked when or where if I ever laid hands on him.
> Q:  No.  I asked you:  During this incident, did you ever lay hands on [Father]?  And you said no.
> A:  The time that he would abuse me at home, I said no.
> Q:  I'm asking about September 10, 2019?
> A:  You never asked if it was for September 10, 2019.

***Id.*** at 143.

We note that the trial court admitted Father's video evidence and marked it as exhibit P-18, but that this video is not part of the certified record.  ***See*** N.T., 9/6/24, at 138.  Pa.R.A.P. 1926 provides that "[i]f anything material to a party is omitted from the record . . . or is misstated therein, the omission or misstatement may be corrected[.]"  Pa.R.A.P. 1926(b).  "[T]he responsibility rests upon the appellant to ensure that the certified record on appeal is complete in the sense that it contains all of the materials necessary for the reviewing court to perform its duty."  ***Commonwealth v Bongiorno***, 905 A.2d 998, 1000 (Pa. Super. 2006) (*en banc*) (citation omitted), *cited by* ***In re J.L.H.***, 273 A.2d 1022, 2022 WL 334149, *4 (Pa. Super. filed Feb. 4, 2022) (unpublished mem.).  ***See*** Pa.R.A.P. 126(b) (providing that we may cite to non-published decisions of this Court filed after May 1, 2019 for their persuasive value).  As Mother does not rely on this evidence, we conclude that our review of Mother's appeal is not impeded by this omission.

On cross-examination, Mother testified that she informed the custody master on November 8, 2019, about Father's alleged abuse but conceded that there is nothing in the resulting custody order of December 2, 2019, that "suggest[s] that [Children] were in any [] danger from [Father.]" *Id.* at 111-13. Further, when the parties attended a hearing in October 2021 on a contempt petition filed by Father, Mother did not raise any abuse allegations against Father, nor had she ever reported Father's alleged abuse to police. *Id.* at 111-13. Mother further testified that, while she alleged that Father abused her for over eight years, Father had never hit Children and that "[h]e has been a good father to [Children]." *Id.* at 105, 125.

With regard to being late with Children, including for custodial pick-ups and extracurricular activities, Mother conceded that she was sometimes "five to ten minutes late" due to rush hour traffic, or getting gas, or needing to pull over to nurse her baby. *Id.* at 102-03, 121, 123. Mother testified that she knew her driver's license was suspended from April 3, 2024 to June 12, 2024, but she still drove Children during this time. *Id.* at 113-14. With regard to her boyfriend, D.G., who lived with her and who has a DUI conviction, Mother testified that he "does [] assist in [] daily activities as it related to the minor children that reside in [Mother's] house[]" but also that he "works overnights, so during the daytime he sleeps[.]" *Id.* at 106, 116. Mother admitted that she had "poor communication with [Father,]" and that she took away Children's phones when they were in her care which resulted in "cutt[ing] off communication between [Children] and [Father.]" *Id.* at 120. Mother also

testified, however, that Children could use her 20-year-old son's phone or her phone to communicate with Father. *Id.* In terms of ensuring Children attend their extracurricular activities, Mother testified that "I wasn't told anything until that date that [Father] said [Son] missed such and such[,]" and that Son also did not give her advance notice of his schedule. *Id.* at 121-22. Mother testified that she attends Children's practices and games during her custodial times. *Id.* at 122. With regard to truancy actions against Children for un-excused absences and tardiness during her periods of physical custody, Mother testified that she did not remember any such actions. *Id.* at 120.

Mother testified that prior to the interim order of September 18, 2023 she had primary custody of Children and requested that the trial court enter a "50/50 physical custody schedule." *Id.* at 103-04.

On August 1, 2024, the trial court entered a custody order which granted Father primary physical custody during the school year, including all school days and every other weekend, and Mother partial physical custody, including every alternate weekend. *See* Trial Ct. Order, 8/1/24, at 1-2. In an accompanying opinion, the trial court identified the custody factors contained in 23 Pa.C.S. § 5328 of the Child Custody Act and how it weighed each factor in awarding custody. *See* Trial Ct. Order and Op., 8/1/24 at 3-6. Specifically, the trial court found that Sections 5328(a)(6) and (a)(7) weighed in Mother's favor while Sections 5328(a)(1), (3)-(5), (9)-(13) weighed in favor of Father or against Mother, and the remaining factors were inapplicable or neutral. *Id.*

Mother filed a timely notice of appeal and both Mother and the trial court complied with Pa.R.A.P. 1925. On appeal, Mother raises the following questions:

1. Did the trial court abuse its discretion or commit an error of law [] in that it removes [Mother's] shared 50/50 physical custody of [Children] and instead awards, grants and orders the switching of [] primary physical custody of [Children] solely to [] Father?

2. Did the trial court abuse its discretion or commit an error of law, based upon the testimony of record below, in failing to follow the mandates and factors set forth in 23 Pa.C.S. § 5328?

3. Were the trial court's conclusions unreasonable as shown by the evidence of record?

4. Did the trial court abuse its discretion or commit an error of law by failing to enter a custody order that is in the best interest of [Children]?

Mother's Brief at 2-3 (some formatting altered).

Mother argues that the trial court "abused its discretion and erred as a matter of law in failing in its stated reasons to consider the best interests of [Children,]" for each custody factor that the trial court found did not favor Mother and one custody factor that the trial court deemed was neutral between the parties. *See* Mother's Brief at 7-18, 21. Specifically, Mother argues that "there was insufficient information in the record to support the . . . decision to change the . . . prior orders and to permit [Children] to be in [] Father's [ ] primary physical custody." *Id.* at 22. Mother also contends that she is the more stable parent "considering [Father's] past problems and current limitations." *Id.* at 24.

- 13 -

Before reaching the merits of Mother's claims, we address which issues are sufficiently developed for our review, as "this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority." *In re M.Z.T.M.W.*, 163 A.3d 462, 465 (Pa. Super. 2017) (citations omitted); *see also* Pa.R.A.P. 2119(a), (c) (providing that the argument section of an appellate brief shall contain discussion of issues raised therein and citation to pertinent legal authorities and references to the record). "Where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived." *M.Z.T.M.W.*, 163 A.3d at 465-66 (citation omitted and formatting altered). "We shall not develop an argument for an appellant, nor shall we scour the record to find evidence to support an argument; instead, we will deem [the] issue to be waived." *Milby v. Pote*, 189 A.3d 1065, 1079 (Pa. Super. 2018) (citation omitted).

Here, in her claim regarding Section 5328(a)(5), "[t]he availability of extended family[,]" Mother argues that the trial court "completely ignores the availability of [Mother's] extended family[.]" *See* Mother's Brief at 15. Mother fails to cite to the record for evidence of the availability of Mother's extended family to help care for Children and we have not identified any such evidence in our review of the record. With regard to Section 5328(a)(13), the level of conflict between the parties, Mother states that the trial court "erred in failing to find in favor of [Mother]" without citing to the record or any relevant

- 14 -

authority, or making a cognizable argument. *Id.* at 18. As Mother has failed to develop these claims for appellate review with citations to the record and/or relevant authority, we conclude that the claims with regard to Sections 5328(a)(5) and (13) are waived. *See* Pa.R.A.P. 2119(a), (c); *M.Z.T.M.W.*, 163 A.3d at 465-66; *Milby*, 189 A.3d at 1079.

Turning to the merits of Mother's remaining claims, for custody matters governed by the Child Custody Act, 23 Pa.C.S. §§ 5321-5340, our standard of review is as follows:

> [i]n reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law[] or are unreasonable in light of the sustainable findings of the trial court.

*E.R. v. J.N.B.*, 129 A.3d 521, 527 (Pa. Super. 2015) (citation omitted); *see also R.L. v. M.A.*, 209 A.3d 391, 395 (Pa. Super. 2019) (explaining that "a trial court abuses its discretion if, in reaching a conclusion, it overrides or misapplies the law, or the record shows that the trial court's judgment was either manifestly unreasonable or the product of partiality, prejudice, bias or ill will" (citation omitted and formatting altered)). "[W]hen explaining its conclusions as to the section 5328(a) factors, the trial court necessarily

- 15 -

resolve[s] conflicts in testimony and [makes] credibility determination[s]." *M.J.M. v. M.L.G.*, 63 A.3d 331, 336 n.6 (Pa. Super. 2013). We apply a deferential standard of review to claims of abuse of discretion, as it is not this Court's role to "re-find facts, re-weigh evidence, and re-assess credibility." *Wilson v. Smyers*, 284 A.3d 509, 520 (Pa. Super. 2022) (citation omitted).

In awarding custody pursuant to a petition to modify, a trial court "shall delineate the reasons for its decision on the record in open court or in a written opinion or order[]" and "shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child." *See* 23 Pa.C.S. § 5323(d), 5328(a). In considering the factors set forth in Section 5328(a), "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." *Taylor v. Smith*, 302 A.3d 203, 208 (Pa. Super. 2023) (citing, *inter alia*, *M.J.M.*, 63 A.3d at 336 (citations omitted)). In *M.J.M.*, this Court found no error where a trial court "addressed the section 5328(a) factors in its Explanation of Decision and merely expanded on its findings in the Pa.R.A.P. 1925(a) Opinion[.]" *See M.J.M.*, at 336-37.

The paramount concern in any custody case decided under the Child Custody Act is the best interests of the child. *See* 23 Pa.C.S. §§ 5328(a), 5338(a). "The best-interests standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual, moral[,] and spiritual well-being." *Taylor*, 302 A.3d at

207 (citation omitted). Section 5328(a) sets forth the best interest factors that the trial court must consider in awarding custody. *See E.R.*, 129 A.3d at 527.

Section 5328(a) of the Act provides as follows:

**§ 5328. Factors to consider when awarding custody**

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a).[10]

Here, Mother argues that the trial court abused its discretion in finding that Section 5328(a)(1) favors Father and Section 5328(a)(2) was neutral because Father has been abusive to Mother in the past and due to the 2019 PFA order. *See* Mother's Brief at 13. Mother notes that she presented "actual photographs of injury" at the custody hearing and R.C. corroborated her

_____

[10] These are the custody factors that were in effect at the time the trial court made its decision. Effective August 13, 2024, Section 5328(a) was subsequently reordered and amended. *See* 23 Pa.C.S. § 5328 (amended April 15, 2024, P.L. 24, No. 8, § 3, effective in 120 days).

account of abuse. *See id.* Mother contends that her failure to communicate with Father about Children is the result of trauma, nervousness, and anxiety caused by Father's abuse. *Id.* at 12. Mother argues that the trial court "over-reacted to the inflammatory accusations of . . . Father[]" and in doing so failed to "sufficiently consider and analyze all the testimony" and "ignore[ed] the best interests of [Children]." *Id.* at 20-21, 24.

With regard to PFA orders, this Court has held that a "consent-based agreement[]" to a PFA order does not equate to an admission of abuse. *See Commonwealth v. Nelson*, 690 A.2d 728, 731 (Pa. Super. 1997). Where a PFA order is entered by consent or agreement of the parties, such an order "does not constitute evidence of abuse or a judicial determination" of abuse. *See Corrado v. Corrado*, 315 A.3d 90, 2024 WL 688281, at *10 (Pa. Super. filed Feb. 20, 2024) (unpublished mem.).

Here, the trial court concluded that Section 5328(a)(1) favored Father because of the difficulties that Father experiences contacting Children when they are in Mother's care. *See* Trial Ct. Order and Op., 8/1/24, at 3. For Section 5328(a)(2), the trial court noted that Mother had obtained a PFA order against Father in the past, but found that this factor was neutral. *Id.* at 4. In its Rule 1925 opinion the trial court states that it "had the opportunity to observe the witnesses during their testimony and made its determination based upon those observations and all the evidence presented during the custody trial." Trial Ct. Op., 9/27/24, at 13. Mother does not dispute that, as the trial court found, "it is Mother who has taken [Children's] phones from

them and would not allow contact with Father[,]" and when Children are with Mother that "Father has problems contacting [Children] and Mother." *Id.* at 15; Trial Ct. Op., 8/1/24, at 3.

Mother testified inconsistently about her conduct in the September 2019 incident of Father's alleged abuse that preceded her filing a PFA petition against him. *See* N.T., 7/15/24, at 101-02, 143. As the parties disputed whether Father ever abused Mother, and the prior PFA order was a consent-based agreement and therefore is not evidence of abuse, the trial court was obliged to resolve the conflicts in the parties' evidence and to make credibility determinations. *See M.J.M.*, 63 A.3d at 336;[11] *Nelson*, 690 A.2d at 731; *Corrado*, 2024 WL 688281 at *10. Here, the record reflects that the trial court took the conflicting evidence into account and decided how factors (1) and (2) weighed between the parties. We detect no error of law or abuse of discretion in the trial court's conclusions and therefore find no merit to Mother's claims for these factors.

With regard to Section 5328(a)(3), (9), and (10), Mother argues only that the trial court failed to state its reasons for its finding. *See* Mother's Brief at 13, 15. However, "there is no required amount of detail" for a trial court's explanation for a custody award, only that the trial court considered the custody factors and made a decision "based on those considerations." *See*

---

[11] We note that making and placing credibility determinations on the record are well within the trial court's discretion, and doing so assists this Court in conducting appellate review. *See E.R.*, 129 A.3d at 527.

*Taylor*, 302 A.3d at 208.  Here, in its Rule 1925(a) opinion, the trial court expanded on its earlier opinion, identifying the evidence it found applicable in weighing these factors, including that Mother does not ensure that Children consistently attend school or extracurricular activities, that Mother does not timely respond to Father, and has shown an unwillingness to cooperate with Father regarding Children.  **See** Trial Ct. Op., 9/27/24, at 12, 14-16.  As the trial court considered these custody factors in its opinions of August 1, 2024 and September 27, 2024, we conclude that there is no merit to Mother's argument with regard to Section 5328(a)(3), (9), and (10).  **See M.J.M.**, 63 A.3d at 336-37.

Next, Mother challenges the trial court's conclusion regarding Section 5328(a)(4), Children's need for stability and continuity.  Here, Mother contends that her reasons for "any absences" were temporary in nature, such as "the need to care for her other four (4) children[]" and that while under her care Children "were doing well in school" and "were never in trouble or disciplined."  **See** Mother's Brief at 14.

Here, the trial court found that "Mother is unable to meet [Children's] needs relating to [their extracurricular] activities and the demands of transporting them at this time.  This creates instability in [Children's] lives."  Trial Ct. Op., 8/1/24, at 4.

We find no support in the record for Mother's argument that her obligations to care for her other four children are temporary in nature and that Mother, rather than Father, can better provide appropriate care and

supervision to Children for schoolwork and extracurricular activities at this time. Nor can we reconcile truancy actions for Children's unexcused absences and tardiness, which Mother does not dispute, with Mother's contention that Children were "never in trouble or disciplined" while in her care. *See* N.T., 7/15/24, at 12, 122. As noted above, we defer to the trial court's findings regarding weight of the evidence and credibility where, as here, they are supported by the evidence in the record. *See Taylor* 302 A.3d at 207; *Wilson*, 284 A.3d at 520. For these reasons, we detect no abuse of discretion or error of law in the trial court's conclusions and find no merit to this claim. *See E.R.*, 129 A.3d at 527; *see also R.L.*, 209 A.3d at 395; *M.J.M.*, 63 A.3d at 336.

For Section 5328(a)(11), the proximity of the parties' residences, Mother argues that she objected to Father's transportation of Children from his home in Scranton in Lackawanna County to their school in Hanover in Luzerne County. *See* Mother's Brief at 17. Mother also argues that she "introduced evidence that [Father] has been arrested for Driving under the Influence, Public Drunkenness and Disorderly Conduct/Engaged in Fighting." *Id.*

Here, the trial court noted that Mother's lack of a driver's license was "an impediment to her being able to be timely in custody exchanges and participating in [Children's] activities." Trial Ct. Op., 9/27/24, at 15-16; *see also* Trial Ct. Op., 8/1/24, at 5-6 (stating that "Mother alleges that rush hour makes it difficult to pick up [Children]. Mother does not currently have her

driver's license; this greatly impacts the safety and stability of [Children]"). Mother's license suspension ended on June 12, 2024. **See** Ex. P-15.

Mother provides no cite to the record to support her contention that Father has been arrested for DUI; rather, the record reflects that Father has convictions related to non-driving conduct involving alcohol consumption that occurred in 2010, 2015, and 2020, and it is Mother's boyfriend, D.G., who has a DUI conviction. **See** N.T., 7/15/24, at 22-25, 107. Father and A.P. both testified that Father has since reduced his alcohol consumption and no longer conducts himself in the same manner as when he incurred these prior convictions. **Id.** at 28-29, 31. Mother was often late in transporting Children to school, extracurricular activities, and custody exchanges, in addition to her temporary driver's license suspension. **See** N.T., 7/15/24, at 42-43, 55-56, 113-14; Ex. P-15. Father presented evidence that he ensured that Children attended school and their extracurricular activities in a timely manner. **See** N.T., 7/15/24, at 14-15, 19-20, 52-55. Therefore, we discern no abuse of discretion or error of law in the trial court's findings regarding Section 5328(a)(11), and conclude there is no merit to Mother's claim. **See E.R.**, 129 A.3d at 527; **see also R.L.**, 209 A.3d at 395; **M.J.M.**, 63 A.3d at 336; **Wilson**, 284 A.3d at 520.

Lastly, for Section 5328(a)(12), each party's availability and ability to care for Children, Mother argues, based solely on her testimony, that "she is able to accommodate [Children's] extracurricular activities and pick-up [Children] when they are done." Mother's Brief at 17.

Here, the trial court concluded that "Mother is far less available and only attends events she knows about or are during her periods of custody." Trial Ct. Order and Op., 8/1/24, at 6.

As stated above, Children were deemed truant under Mother's care. **See** N.T., 7/15/24, at 12, 51-52, 71. In addition, the evidence supports a finding that Children consistently attend their extracurricular activities during Father's custodial times. **See id.** at 19-20, 53. Father's fiancée, Father's parents, and Father's sister care for Children when he is not available. **See** N.T., 3/14/24, at 12-13, 15; N.T., 7/15/24, at 14-15, 19-20. Mother, in contrast, has four other children, including two aged two years and younger, and no resources in terms of a relative or partner consistently able to step in to care for Children when Mother is not available. **See** N.T., 7/15/24, at 80-83, 102-03, 116, 121, 123. On this record, the trial court was well within its discretion and committed no error of law in finding that this factor weighs against Mother, and we conclude there is no merit to this claim. **See E.R.**, 129 A.3d at 527; **R.L.** , 209 A.3d at 395; **M.J.M.**, 63 A.3d at 336; **Wilson**, 284 A.3d at 520.

As we discern no abuse of discretion or error of law in the trial court's findings regarding the custody factors under Section 5328(a), nor the trial court's resulting award of custody, we affirm the trial court's order.

Order affirmed.  Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/17/2025