J-A18019-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| ALISHA M. SPOSATO | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANTHONY SPOSATO, II | : | No. 189 EDA 2025 |

Appeal from the Order Entered December 17, 2024
In the Court of Common Pleas of Delaware County Civil Division at
No(s): CV-2020-003763

BEFORE: OLSON, J., DUBOW, J., and BECK, J.

MEMORANDUM BY BECK, J.:                 **FILED OCTOBER 10, 2025**

Alisha M. Sposato ("Mother")[1] appeals from the final custody order entered in the Delaware County Court of Common Pleas ("trial court") awarding Mother and Appellee, Anthony Sposato, II ("Father"), shared legal custody and Father partial physical custody of the parties' three children, A.S. (born June 2010), D.S. (born May 2012), and O.S. (born January 2016) (collectively, "the Children"). After careful review, we affirm.

We begin with an overview of this protracted and contentious custody battle, as set forth by the trial court in its sixty-eight-page findings of fact and conclusions of law in support of its final custody order:

> The [trial c]ourt has repeatedly remarked that this matter is reminiscent of Charles Dickens' Bleak House. It is also reminiscent of a Greek tragedy. The conflict between the parties

_____

[1] Mother now goes by the surname Angelozzi.

has been long and profound. The [trial c]ourt has found itself with a birds[']s eye seat to witness the emotional and psychological impact on both parents. Most importantly, the [trial c]ourt has witnessed the adverse psychological and emotional impact of the parties' inability to resolve this custody dispute has had on the [C]hildren. Notwithstanding the best efforts of multiple mental health providers, experts, the attorneys, [and] the guardian ad litem [("GAL")], the chasm between these parties has become deeper, with Mother [] seeking that Father's physical custody be supervised.

Despite multiple days of trial, the crux of this dispute can be easily summarized: each parent contends that the other parent poses a safety risk. Mother alleges that Father suffers from fits of rage, is abusive and has proved himself an indifferent father. Child[L]ine[2] reports alleging abuse have also been filed during the pendency of this custody action. Mother claims that [the C]hildren are not safe with Father.

On the other hand, Father denies that he suffers from fits of rage. Further, he alleges that all of the investigations of allegations of child abuse have also been deemed unfounded by child protective services and these allegations have no merit.

Father further alleges that Mother's actions adversely impacted the [C]hildren's safety. He claims that Mother has engaged in "parental alienation," thus resulting in the severance of his parental ties with the [C]hildren to the extent that the [C]hildren are afraid of him, manifest inappropriate anger against him, and no longer wish to see him at all. He claims that Mother fostered that fear and those estrangements in the [C]hildren. Finally, he claims that this "parental alienation" has greatly affected the [C]hildren's mental health. He seeks shared physical custody and legal custody.

Findings of Fact and Conclusions of Law in Support of Final Custody Order,

12/17/2024, at 22-23.

_____

2 **See** 55 Pa. Code § 3490.4 (defining ChildLine); **see also** 23 Pa.C.S. §§6301-6388 (Child Protective Services Law).

The nature of this case, as well as the issues raised by Mother on appeal, require a lengthier-than-usual recitation of the facts and procedural history underlying this matter. Mother and Father married in January 2005. On June 15, 2020, Mother filed a complaint for custody seeking primary physical and joint legal custody.[3] Mother simultaneously filed a petition for exclusive possession of the martial home, claiming Father voluntarily left, had rages of anger, argued and fought with her in front of the Children, damaged property in the home, and kicked down the door to the primary bedroom while she was inside. On August 12, 2020, the trial court approved the parties' stipulation granting Mother exclusive possession of the marital home.

Following a custody conference, a hearing officer recommended the parties share legal custody and Mother have primary physical custody subject to Father's partial custody, which occurred every Thursday from 4:00 p.m. to 8:00 p.m., every other Saturday from 9:00 a.m. to 9:00 p.m., and every other Sunday from 9:00 a.m. to 8:00 p.m. The trial court approved these recommendations on September 8, 2020.

---

[3] On the same date, Mother filed a complaint in divorce, which included counts for primary physical and joint legal custody.

The next month, Father sought to modify his custody.[4]  He also filed a petition for contempt,[5] which the trial court denied without prejudice on November 9, 2020.  Following a second custody conference, a hearing officer recommended the parties continue the same physical custody schedule with additional terms,[6] which the trial court approved on December 3, 2020.

On February 3, 2021, Father filed a petition for contempt, claiming that Mother failed to ensure the Children answer his daily phone calls and that Mother disparaged him in front of them.[7]  Shortly thereafter, the parties appeared before a hearing officer, who recommended Father's partial physical custody increase to overnight visits every other weekend and the parties begin

_____

[4] Father asserted he received limited partial physical custody because Mother alleged he was abusing steroids.  After his court-ordered urine test proved negative, he sought joint legal and shared physical custody.

[5] Father alleged Mother unilaterally removed Father's access to the parental controls of a communication application, "Messenger Kids," which both parents previously controlled; blocked him from messaging or videoing with the Children; and unilaterally enrolled the Children in sports and activities without consulting him.

[6] The modifications included allowing the non-custodial parent a daily phone call at 4:00 p.m.; ordering the parties to attend family counseling and follow recommendations; allowing the Children to continue their sports and activities; prohibiting the parties from call blocking, disparaging each other, and discussing significant others and custody matters with the Children except in therapy; and working with the family therapist on overnight visits with Father.

[7] The trial court scheduled a hearing on the petition for May 19, 2021; that same date, Father withdrew the petition.

- 4 -

co-parent counseling with Andrea Serber, MSS, LSCW, QCSW. The trial court approved the recommendations on February 16, 2021.

On May 23, 2021, Mother and Father were involved in an incident in the parking lot of an ice rink where two of the Children played hockey, which the trial court found was a "seminal moment in this dispute" and "mutual commission of domestic violence." Memorandum and Interim Order, 3/16/2022, at 2. Mother and her mother ("Maternal Grandmother") confronted Father outside as he was getting the Children into his vehicle. *Id.* Mother started a verbal altercation with Father, which escalated to Mother spitting on Father's face, "an action which prompted Father to lay hands on Mother's face and resulted in a black eye." *Id.* at 2-3. Father claimed he was trying to push Mother away; Mother claimed that he punched her. *Id.* at 3. The trial court found "both parties at fault, particularly Mother for having instigated an inappropriate conversation in the presence of the [C]hildren and striking the first blow." *Id.* at 3. Police were summoned, no charges were filed, and the parents each obtained temporary protection from abuse ("PFA") orders against each other.[8] *Id.* Father exercised his partial custodial custody immediately following the ice rink incident and again two weeks later during the weekend of June 4, 2021. As discussed below, what followed was a nearly

_____

[8] The parties withdrew the temporary PFA orders on December 2, 2021. *Id.*

three-year period where Father did not enjoy any custodial time with the Children.

On June 28, 2021, the parties appeared for a custody conference before a hearing officer, at which Ms. Serber testified. Ms. Serber stated that she had been working with the family since February 2021 and developed with Mother and Father a detailed six-page addendum to their current custody order.[9] N.T., 6/28/2021, at 3-4. She described the family dynamic as "super contentious" and testified that she recently tried to help get the Children to go with Father for his custodial time on Father's Day weekend in June 2021, but they refused to get out of the car. *Id.* Ms. Serber testified that the Children had previously been going with Father and "enjoying their time" but they were now "definitely … suffering from severe split loyalties." *Id.* at 5. She further testified that she had worked with Mother in advance on strategies to communicate with the Children to successfully transition them to Father's care. *Id.* at 4-5. She believed "very strongly" that the Children were "in tune" with the parents' contentiousness, experiencing "a lot of internal conflict," and it was easier for them to "just stay with [Mother] at this point" because they were "aligned with [her]." *Id.* at 5. She explained that they

_____

[9] We note that the trial court found that if Mother and Father had followed the guidelines in the addendum they crafted with Ms. Serber, "it is unlikely that the aggravated conflict between the parties would have persisted." *See* Findings of Fact and Conclusions of Law, 12/17/2024, at 5 n.6.

were "feeling guilty" not seeing Father but afraid to disappoint Mother if they went with him. *Id.*

The hearing officer adopted the addendum with certain modifications. In pertinent part, it provided that Father have partial physical custody during the summer on an alternate weekly schedule: week A from Thursday at 4:00 p.m. until Monday at 4:00 p.m., provided Father proved he worked the day shift remotely from home and could adequately supervise the Children, and week B from Thursday at 4:00 p.m. to Friday at 8:00 p.m. Further, the hearing officer recommended: (1) no weapons in the parties' homes; (2) the parties must follow all court orders, including PFA, criminal, and civil orders; (3) no physical or verbal altercations in the presence of the Children; (4) the Children to continue with their counselor, Season Apple; (5) the parties to continue co-parent counseling with Ms. Serber; and (6) custody exchanges to occur at the local police department. The trial court approved the recommendations in a temporary custody order on July 2, 2021.

Father filed an emergency petition in custody on July 7, 2021, alleging that the Children continued to refuse to visit him during his custodial time because of Mother's disparagement of him to the Children. The trial court denied it without prejudice the next day, finding that Father failed to allege any facts suggesting imminent harm to the Children. The following day, on July 9, 2021, Father filed an appeal of the temporary custody order and a demand for a hearing.

In early August 2021, the parties filed petitions for contempt against each other,[10] which resulted in the parties' agreement to, and the trial court's approval of, an addendum to the temporary custody order on September 24, 2021. The September 24, 2021 addendum provided a fifteen-minute grace period for custodial exchanges; the Children to continue therapy with Ms. Apple; Mother and Father to continue co-parent counseling with Ms. Serber; and the parties to consider modification of their PFA order.

On November 21, 2021, the parties met with Ms. Serber. She first met with Mother and the Children, and after Mother left, Father arrived. Ms. Serber reported that the Children initially hesitated to interact, but within a very short time, the younger two children, D.S. and O.S., began laughing and discussing old memories with Father, and showed "no sign of fear or emotional discomfort." N.T., 2/18/2022, Ex. D-3 (Ms. Serber email dated November 21, 2021). The oldest child, A.S., did not engage with Father. Ms. Serber believed this was a very positive approach that would likely prove positive for A.S. as well, but for that to happen, the Children must "know and really believe that both their parents are supportive and encouraging with them participating and

---

[10] Father asserted, among other things, that the Children continued to refuse to go with him during his custodial time because of Mother's disparagement of him to the Children and that he had enjoyed no custodial time since at least the temporary custody order. Mother countered by asserting in her petition that Father impermissibly contacted A.S. directly instead of through Mother; used third parties for custodial exchanges; failed to attend certain sporting events of the Children in May, June, and July 2021; and spent his May 21-23, 2021 custodial weekend in the presence of his girlfriend.

being a part of defining what moving forward/healing with [Father] looks like. If the [C]hildren feel this true encouragement, the time with [him] would improve." *Id.*

Two days later, on November 23, 2021, the parties agreed to a second addendum to the temporary custody order, which the trial court approved on December 1, 2021. The December 1, 2021 second addendum provided that the parties' respective petitions for contempt be held in abeyance; Ms. Serber work with the parties to address Father's make-up custodial time; the parties conduct custodial exchanges at Ms. Serber's office; Mother encourage the Children to go with Father for his custodial time; Ms. Apple be discharged as the Children's therapist; and Ms. Serber refer the parties to a therapist for the Children.[11]

On December 17, 2021, Father filed an emergency petition in custody, alleging, among other things, that since June 18, 2021, the Children refused to go with him during his custodial time; Mother repeatedly posted on social media about Father and held him out as a narcissist and abuser to family, friends, and the Children's teachers and coaches; and that as a result of Mother's disparagement of him to the Children, his relationship with them deteriorated to the extent that the two oldest children responded with profanity or hateful messages when he said he loves them.

---

[11] The Children began therapy with Nadine Colgan, MS, NCC, LPCMH in late December 2021.

The trial court scheduled a hearing on the parties' petitions in contempt that had been held in abeyance, as well as Father's emergency petition in custody. In the meantime, the parties agreed on January 31, 2022, to a third addendum to the temporary custody order. The third addendum detailed, among other things, Mother and Father's duties to resume co-parent counseling sessions with Ms. Serber, continue the Children's therapy with Ms. Colgan, and initiate reunification therapy with Ms. Serber between Father and the oldest child, A.S. The trial court approved the addendum on February 9, 2022.

The trial court held three hearings in mid-February and early March 2022 on the parties' August 2021 petitions in contempt and Father's December 2021 emergency petition in custody. At the February 18, 2022 hearing, the trial court qualified Ms. Colgan and Ms. Serber as experts in the areas of family-based therapy and reunification counseling and admitted their respective reports. *See* N.T., 2/18/2022, at 33, 82, Exs. D-1 (Colgan report dated February 16, 2022), D-2 (Serber report dated February 14, 2022).

Ms. Serber reported that during the past year of working with the family, she discussed with Mother and Father their parental influence and the necessary strategies to ensure the Children "did not adopt unnecessary anxiety or negative emotion towards either parent." *Id.* at 85, 87, Ex. D-2. However, "[r]ather than progressing in a positive direction" during that time, tensions increased and issues escalated, "resulting in the [C]hildren having

major split loyalties[ and] pure anger towards [Father]" and they had "become completely estranged" from him. *Id.*, Ex. D-2. She described a time when the parties agreed to meet as a family; one of the goals was for the parents to express to the Children that "whatever the parental problems may be," they have "two parents who love them." *Id.* In preparation, Ms. Serber encouraged both parents to share with the Children that they were sorry for the ice rink incident, they both were at fault, and they feel horrible that the situation got out of hand. *Id.* She stated that both parties recognized the focus of the meeting was "to allow for acknowledgement, clarity, and forgiveness" so the Children could hear that their parents wanted everyone to move forward. *Id.* However, the meeting was unsuccessful because Mother "was unable to follow the script," believing Father continued to lie and "she could not be disingenuous" with the Children. *Id.* Ms. Serber noted that an "often parroted opinion" of the Children is that Father is a liar. *Id.*

Ms. Serber further reported that the Children denied "any specific rupture" with Father and the younger two, D.S. and O.S., said, among other things, that Father has rage and aggression problems but could not provide any specific examples when asked. *Id.* She explained that the Children "feel the need to stick with the narrative and are unwilling to consider forgiveness" of Father. *Id.* The family dynamic had become "overwhelming and confusing" for the Children, and she observed that they all were nervous and often tearful and could not make eye contact with her. *Id.* D.S. and O.S. had "increase[ed]

psychosomatic illnesses that are in concert with symptoms of stress, guilt, and anxiety." *Id.* The Children were not open to therapy and "refuse[d] any efforts to move forward and heal their relationship" with Father. *Id.* Ms. Serber concluded:

> Because the [C]hildren are never able to identify a personal rupture, in their own histories, with [Father] that would result in the guillotine of [him], it is difficult to understand their exaggerated anger response and refusal to interact with [him]. It is true that the [C]hildren often parrot opinions and statements about [Father] that have been made by [Mother] … and that they seem to be angry about issues that would be more adult in nature and developmentally unusual for children to be focused on. For this reason, there is no doubt that the [C]hildren are privy to having some adult information, such as marital information from the past. [Mother] reports making certain that the [C]hildren are not aware of information not meant for them to hear and that their shared anger and upset is from their firsthand experience. [Mother] recognizes that all of what is happening between the [C]hildren and [Father] is becoming an emotional burden on [them], but often feels that if [Father] would just tell the truth, that maybe that might be the start of moving forward. [Father] consistently states that [] the memories that the [C]hildren are reporting about him and their relationships with him are false and because he is certain of this, he can only blame [Mother] for actively working to alienate the [C]hildren from him. Whether alienation or parental influence coupled with the strong alignment with [Mother, the Children are] at high risk of losing their relationships and connection with [Father] for the rest of their childhood. What is agreed to by both parties and [Ms. Serber] is that this continued anger towards [Father] is emotionally damaging and [] requires an intervention to stop the current situation immediately.

*Id.*

The Children's therapist, Ms. Colgan, opined that the Children "have made no progress in individual therapy" with her and "there will be no progress until the parents are able to work together." *Id.* Ex. D-1; *see also*

*id.* at 48. The Children reported to her that they did not like Father because of the ice rink incident, he worked nights and slept during the day when they were younger, he failed to attend some of their sporting events, and he lies. *Id.*, Ex. D-1. She noted that the Children all "parrot each other" regarding Father and that they assign blame for the ice rink incident solely to Father even though both parents were at fault. *Id.* at 77, Ex. D-1. Ms. Colgan observed the Children refuse to interact with Father—when he called and said he loved and missed them they hung up on him within seconds. Based on what the Children told her, Ms. Colgan believed Mother clearly "has put the [C]hildren in the middle and has shared information with them to support the lack of encouragement for [them] to have a healthy, normal relationship with [Father]." *Id.*; *see also id.* at 41-46. She continued:

> The [C]hildren repeat the same phrases and stories and refuse to admit that their relationships with [Father] were positive ones and that he did play a positive role in their lives. No child alienates or erases their relationship with a father over one incident. Even children who are abused by a parent will show up loving that parent and doing their best to please that parent.

*Id.*, Ex. D-1; *see also id.* at 48. She noted that the two older children, A.S. and D.S., did not display any guilt over their behavior toward Father, nor did the Children show any empathy during the phone calls; Mother did nothing to encourage the Children to engage with him or discourage their disrespectful behavior toward him. *Id.*, Ex. D-1. She recommended discontinuing therapy with her because it "only continues the false narrative" from the Children, prevents a relationship with Father, and causes more anger and regression

- 13 -

from the Children. *Id.* at 49-50, Ex. D-1. She recommended the Children participate, with Father only, in a four-day intensive therapeutic program in Great Neck, New York, known as Turning Points for Families ("Turning Points"), followed by a ninety-day period where Father has sole physical custody and the Children are without the influence of Mother. *Id.* at 40, 51, Ex. D-1.

Following the hearings, the trial court entered a memorandum and interim order on March 16, 2022. The trial court denied with prejudice Father's August 2021 petition and granted his December 2021 emergency petition in part.[12] It found that "although Father failed to prove that his weakened relationship with [the C]hildren was a result of Mother's manipulation, a plan needed to be devised to mend Father's and [the C]hildren's relationship before [they] began to experience the long-term damage due to their estrangement from Father[.]"[13] Findings of Fact and Conclusions of Law, 12/17/2024, ¶ 43 (citing Memorandum and Interim Order, 3/16/2022). Thus, the trial court appointed Heather Green, Ph.D., to engage in reunification counseling, treatment, and education with the family. The trial court found that although Mother cooperated in family therapy and co-parent counseling, and brought

_____

[12] Mother withdrew her August 2021 contempt petition.

[13] The trial court found that "Ms. Colgan failed to spend enough time with the [C]hildren to credit her suggestion that Mother alienated [the C]hildren from Father." Memorandum and Interim Order, 3/16/2022, ¶ 7.

the Children for custody exchanges, "her negative attitudes about Father ha[d] infected [the C]hildren to the extent that they no longer wish[ed] to engage in a relationship with him." Order Appointing Dr. Green, 3/16/2022. Ultimately, Dr. Green's efforts to reunify Father and the Children were unsuccessful.

On June 20, 2022, the trial court appointed Ms. Jordan Reilly as the GAL for the Children, and on July 7, 2022, appointed Constance Mesiarik, Ph.D., J.D., as a custody evaluator. The trial court ordered Dr. Mesiarik to perform custody and psychological evaluations and prepare a written report with specific recommendations for legal and physical custody.

The GAL submitted a report to the trial court on October 4, 2022. She reported that "[t]here is universal agreement among the clinicians involved in this case that Mother has engaged in severe parental alienation that has caused and continues to cause serious harm to the [C]hildren." N.T., 10/4/2023, Ex. C-1 (GAL Report dated October 4, 2022). With respect to the ice rink incident, the GAL reported that the Children all "found that Father was solely and unforgivably responsible," which was unsupported by a video of the incident. *Id.* She noted that each child remembered their family vacations with Father, including a trip to Disney, as fun but were unwilling to associate that fun with Father. *Id.* The GAL reported that the Children did not use age-appropriate language to describe Father but engaged in "completely normal conversation" on other topics. *Id.* When the Children gave reasons for not

wanting anything to do with Father, the GAL noted that they "referenced things of which they should have no direct knowledge," and when the GAL questioned them, the Children unsuccessfully tried to "turn those reports into personal recollections." *Id.* She explained that standard reunification counseling was problematic because any progress made with the Children in individual sessions "was immediately undone by Mother" and that the Children "would end one session being very affectionate and open to time with Father but would return for each new session angrier and more determined to isolate from Father." *Id.* Because of this, the GAL agreed with the other involved clinicians as to the need for a "drastic reunification protocol" and recommended Turning Points. *Id.* She further recommended that Father be awarded temporary sole legal and physical custody of the Children to allow program participation "without sabotage from Mother." *Id.* The GAL also recommended Mother attend individual therapy and demonstrate her commitment to fostering a healthy relationship between the Children and Father before she resumed any significant physical custody. *Id.* The GAL opined that "delaying drastic reunification is harmful to the [C]hildren as Mother's relentless alienation of Father is tantamount to abuse," and the longer the pattern continued, the more harm it will cause to the Children, their self-esteem, and their ability to engage in healthy future relationships. *Id.*

Dr. Mesiarik spent approximately one year evaluating the family before authoring her fifty-six-page custody report on July 6, 2023. Therein, she

opined that "Mother's anger towards Father [] continued to contribute to the deterioration of his relationship with the [C]hildren" because she appeared "to have modeled these behaviors in front of" them. N.T., 10/3/2023, Ex. D-2 (Dr. Mesiarik Evaluation, 7/6/2023). Although the custody matter was "far from peaceful" during the first year after separation, she noted a "significant deterioration" after the ice rink incident in May 2021.

> It is important to note that there were no allegations made at the time of separation that Father was physically abusing the [C]hildren. In reviewing the case history, it is apparent that Mother also denied physical abuse by Father towards her as recently as her [e]mergency [r]oom visit in May 2021, and there were no reports of physical abuse in the mental health records [] received from LifeStance, where Mother sought individual counseling following separation. With regards to the [C]hildren, Mother reported that she later learned that the [C]hildren reported that Father had physically abused them; specifically, he would hit them and threaten to hit them more if they told Mother. … When I asked the [C]hildren about these allegations, none of them were able to provide specific examples of something that had occurred leading to Father hitting them, though [D.S.] did state Father would hit them, which he pointed out without any prompting "left a red mark on [them]." The [C]hildren primarily made statements suggesting that Father was not involved in their daily lives. [A.S.] even reported that the relationship "wasn't horrible." I am concerned about the fact that the [C]hildren have worked with multiple counselors with experience in working with families in similar circumstances. All four counselors the family worked with denied the [C]hildren ever reporting to them that Father hit them, even though, in their role, they would have focused on asking the [C]hildren about their relationship with Father. Most recently, I received an email from Mother with concerns that seemed to suggest Father possibly engaging in sexually inappropriate behavior with the [C]hildren. As examples, she wrote that Father has slept next to the [C]hildren in his underwear, that he has reached into her car and grabbed [A.S.'s] thigh, and that he has forced his affection on the [C]hildren in the form of hugs and kisses, which made them feel uncomfortable.

I have significant concerns in how the [C]hildren have presented, not just with me, but with other providers as well. Their absolute refusal to see [F]ather is extreme and not proportional to the reasoning they provide. Additionally, they were generally unable to describe positive interactions they have had with Father in the past, only recalling negative memories. Their negative view of Father has also extended to negative views of his family. For example, they referred to Father's family as alcoholics, an issue which is very adult in nature and not something a young child is likely to even recognize, which suggests they are being influenced by others, whether intentionally or not. Additionally, in my opinion, their behaviors do[ not] demonstrate fear of [F]ather. Rather, the [C]hildren were generally disrespectful in their presentation. Examples include [A.S.] confronting [F]ather and cursing at him or telling him that she hates him, and [D.S.] sending inappropriate texts to Father. I am also very concerned about the information posted online, whether from Mother, her family, or even [her] friends, with social medial posts and the GoFundMe page as examples. These are messages that the [C]hildren may eventually read when they are older and only serve to exacerbate the current situation, and further the hostility inherent in these family dynamics.

*Id.* She reported that the parties' hostility made it impossible for Mother and Father to co-parent and there was "little to no effective communication" between them even though Father has shared legal custody. *Id.* Dr. Mesiarik opined that the Children

have been influenced by [M]other in their relationship with [F]ather. Whether intentional or not, Mother's behaviors have fueled the[ C]hildren's disrespect of and anger towards [F]ather. Mother was clearly angry in response to the circumstances surrounding separation and struggled in managing her anger and her responses to the situation, which was certainly observed by the [C]hildren and created a situation where the [C]hildren were caught in a loyalty bind and did not feel free to love [F]ather and share a relationship with his partner. Furthermore, the counselors who worked with the family also provided examples of their own observations of Mother's behaviors contributing to the [C]hildren feeling this way. What was certainly clear from the information obtained in the current evaluation is how much turmoil [the

C]hildren are currently experiencing. Unfortunately, their ability to address this conflict and heal their relationships in a supportive, therapeutic relationship appears to have been significantly impacted by Mother's consistent interference with efforts to heal and support the relationship the [C]hildren have with Father. It is apparent that Mother has not been receptive to the guidance provided by multiple counselors and that she has done little to try to remedy the situation, the result of which is to cause further harm to [the C]hildren.

I believe the two younger children are also influenced by [A.S.], who is protective of her siblings and outspoken in how she feels about Father. While it is impossible to know with absolute certainty what has transpired between the family members, there is enough evidence to support a finding that the circumstances undoubtedly exacerbated post separation. There was ample evidence to suggest positive relationships between the [C]hildren and [F]ather prior to separation, and even in the year following separation. This is not to say that Father's behavior has been without fault and there is certainly a need for him to address his role in the family dynamics. For example, it is without question that the introduction of a significant other shortly after separation can be difficult for children and, although the [C]hildren may not have met [Father's girlfriend] until later in the relationship, they were aware of Father living with her just four months after their parents' separation. However, I do[ no]t believe there is sufficient evidence to support the intensity of the [C]hildren's anger and hatred toward [F]ather, and there is certainly not enough to support removing Father from the[C]hildren's lives. In my opinion, continuing to limit Father's time with the [C]hildren will ultimately be further damaging to them.

*Id.* Dr. Mesiarik recommended the parties maintain shared legal custody and work toward increasing Father's physical custody, "ideally culminating [in] an equally shared physical custody arrangement." *Id.* However, given the high level of conflict, she considered alternatives to her typical recommendation of reunification counseling and recommended Turning Points or another intensive reunification program. *Id.* Dr. Mesiarik acknowledged that such a program

was an aggressive treatment approach, but she did not believe there were other viable alternatives given the multiple failed attempts to date. *Id.* She further recommended co-parenting counseling and individual therapy for each child and both parents. *Id.*

Following multiple continuances, the trial court scheduled the trial for October 3-6, 2023. The first three days of trial proceeded with testimony from Dr. Mesiarik, the GAL, and Father. The trial court certified Dr. Mesiarik as a psychological expert in custody, reunification, family systems, and custody evaluation. N.T., 10/3/2023, at 14. Dr. Mesiarik confirmed her opinion from her custody evaluation report that the parties should have shared physical custody of the Children. *Id.* at 26. She testified that if the situation was not ameliorated or mitigated, the Children would suffer additional long-term psychological and physiological harm, including an increased risk for stress, anxiety, anger, depression, mood disorders, substance abuse, and physical symptoms such as ulcers and stomach pains. *Id.* at 45-46, 67-70, 159-61. Based on her evaluation, she concluded it was unlikely that Mother could support the Children having a relationship with Father. *Id.* at 60.

On the fourth day of trial, October 6, 2023, the parties reached an agreement to stay the proceedings and resolve the matter. On October 26, 2023, the parties submitted their stipulation, which memorialized the agreement they placed on the record on October 6, 2023. The trial court entered an order approving the stipulation on November 14, 2023. In

pertinent part, the parties agreed: (1) to appoint Stanley Clawar, Ph.D., C.C.S., as the reunification therapist "with the mutually stated goal of working toward shared physical custody"; (2) to follow all recommendations of Dr. Clawar, including those related to their behaviors, attitudes, speech, and interventions; (3) Dr. Clawar shall provide a progress update within thirty days; (4) if Dr. Clawar reported no progress within the first thirty days, Father and the Children shall attend Turning Points; (5) the matter shall be re-listed for a status review hearing every ninety days; and (6) absent compelling circumstances, therapy sessions shall take precedence over all other activities, including work, school, sports, and extracurriculars.

On January 3, 2024, Dr. Clawar issued his interim reunification progress report. Dr. Clawar reported that the Children's recollections of Father were primarily negative, with assertions that he hit them, he hurt Mother during the ice rink incident, he was not around much because of his work schedule, and they feared him. N.T., 1/23/2024, Ex. C-1 (Dr. Clawar Report, 1/3/2024). He opined that their concern for their own and Mother's safety was "perceived danger" and that "[n]o previous evaluation/therapist/GAL believes the [C]hildren are or were in danger vis-à-vis [] Father." *Id.* He noted the ice rink incident was a "pivotal point" for the Children's anger towards and disengagement from Father, but concluded, regardless of what transpired, it was "time to put this to rest and move on with healthier relationships." *Id.*

With respect to Mother, Dr. Clawar reported that she remained adamant that Father was abusive, scary, and aggressive, but "[n]o previous professional corroborated this perspective." *Id.* He stated that Mother's uncorroborated "theme of abuse" was now a central focus for the Children even though "[t]here has been no objective evidence in any evaluation or professional assessment validating Father as 'unsafe' or 'abusive.'" *Id.* He did not observe any meaningful change in Mother's anger as previously reported by numerous professionals, who "all clearly see []Mother as key in an alienation process." *Id.* He noted that Mother exonerates herself of virtually any culpability and has limited self-awareness of "her own hostility and defamatory attitudes and behaviors towards [] Father. *Id.* Dr. Clawar observed that Mother has successfully guided every aspect of the Children's lives (including education, family, extended family, peer, medical, extracurricular activities, personal habits, and communication styles) except their affiliation with Father. *Id.*

Regarding Father, Dr. Clawar reported that he remained "appropriate in concern, questions, and receptivity, even in the face of rejection, hostility, silence, and character attacks" and continued to "make his regular phone calls [to the Children] even though he [was] treated badly (silence, hang ups, and negative dialogue)." *Id.* He noted that Father "spent years politely and diligently doing outreach to [the C]hildren, but to no avail." *Id.*

Dr. Clawar detailed fifteen social factors to explain the Children's "resist and refuse" attitudes and behaviors towards Father, which reflected a circumstantial alienation.[14] *Id.* Dr. Clawar gave the parents a reunification cooperation list; Father agreed without qualification, Mother did not.[15] Dr. Clawar opined that the parties had made de minimus progress, if any, and there was a very low probability of further reunification efforts bringing positive results. *Id.* He stated that his report was "past blame" and the Children "have clearly been negatively impacted" by the custody dispute. *Id.* He found it "important to note that the serial histories of past professionals" "all came to similar observations and conclusions" with the Children on a path to the "point of no return" with the "social death" of Father. *Id.*

The parties appeared for a status review hearing on January 23, 2024, at which Dr. Clawar testified consistent with his report. On February 15, 2024, the parties appeared for another review hearing. Dr. Clawar testified that

---

[14] The factors included: years of separation from Father; Mother's support for social distance; many failed professional attempts; child protective services investigation; court hearings; developed lifestyle without Father; the Children's memory modifications of past events; loss of time with paternal grandparents; the Children's feelings of empowerment; the Children's development of learned scripts to cope; becoming part of an in-group family culture; anxiety about contact with Father; fear of disruption of present, highly schedule lifestyle; the Children's development of protective roles; and being stuck in rituals of negativity. *Id.*

[15] For example, Mother refused to agree to "apologize for past negative and/or hostile statements about the other parent to the [C]hildren" or to "understand my custodial control is a main factor in [the C]hildren's views and behaviors." *Id.*

even though the parties had since both agreed to new reunification guidelines, he had lowered his percentage as to the likelihood of successful reunification. In addition, the trial court conducted an in camera interview of the two younger children, D.S. and O.S.

On February 28, 2024, the trial court entered an interim custody order, finding that the parties had made no progress in reunification counseling with Dr. Clawar and ordering implementation of the stipulated agreement. Beginning March 1, 2024, and continuing for ninety days or until further court order, the trial court ordered Father to have sole legal and physical custody of the Children, and Father and the Children to attend Turning Points from March 2-5, 2024. The trial court appointed Dr. Clawar as its expert in family reunification and ordered the parties to adhere to his forty-three-point reunification guidelines. In addition, because Father was exercising his ninety-day sole legal and physical custody at his parents' home in Cape May, New Jersey,[16] the trial court ordered the Children to temporarily enroll in the online education program through their school district. The trial court further ordered Mother not to engage other mental health providers to evaluate or treat the Children without Father's consent, and not to engage a reunification therapist, other than Dr. Clawar, without court approval.

_____

[16] Father was unable to secure adequate housing in Delaware County, Pennsylvania for him and the Children. The trial court noted that affordable rental housing was in short supply within the Children's school district and ordered him to use his best effort to locate suitable housing within the district.

The trial court scheduled the custodial exchange for March 1, 2024, in front of the Delaware County Courthouse. The Children refused to enter Father's car, resulting in Father's filing of an emergency petition for contempt and enforcement of the interim order. Father averred that (1) Mother and the Children arrived for the custody exchange on March 1, 2024, along with approximately fifteen others, presumably her supporters; (2) the situation involved local police unsuccessfully attempting to assist the transfer of the Children to Father; (3) the crowd surrounded Mother's car and cheered as Mother drove away with the Children; (4) Mother's supporters uploaded a video of the incident and posted a redacted version of the trial court's interim order, along with messages and comments to social media groups (such as One Mom's Battle and Kayden's Korner) disparaging Father, the trial court, Dr. Clawar, and Turning Points; (5) Mother's supporters flooded Turning Points with phone calls accusing its owner of abusing children; and (6) the oldest child, A.S., posted a video of the exchange to her own social media page. ***See*** Defendant's Emergency Petition for Contempt and Enforcement of the Court's February 28, 2024 Order in Custody, 3/4/2024.

Mother responded by averring that (1) she appeared at the custody exchange ready and willing to comply with the trial court's order; (2) she did not act to subvert or prevent the Children from exiting the car; (3) fewer of her supporters attended than Father claimed; (4) she remained until police advised her to leave; (5) her supporters lightly applauded when she left; (6)

she did not post anything on social media about the matter or make any false allegations; (7) she did not know whether A.S. posted the video to her social media page; (8) she drove the Children to Turning Points on March 2, 2024, but it was closed; and (9) she did not act in any way to alienate the Children from Father. *See* Answer to Defendant's Emergency Petition for Contempt, 3/18/2024.

The trial court amended its interim order, directing the parties to appear for a hearing on March 19, 2024, Mother to bring the Children inside the courtroom for the custody exchange, and Mother to immediately remove social media posts relating to this matter and to request that her supporters refrain from publicizing or mischaracterizing any court records.

On March 19, 2024, with at least eight deputy sheriffs present, the parties and their counsel, the Children, the GAL, extended family, and Mother's supporters appeared for the custody exchange. The Children refused to go with Father. The trial court directed Mother to say goodbye to the Children and leave the courtroom. After approximately ninety minutes, the Children relented and went with Father, beginning his ninety days of sole legal and physical custody.

The trial court conducted hearings in April and May 2024, at which the trial court received testimony from Dr. Clawar, the GAL, and Father regarding Father's period of temporary sole custody. It also conducted remote, in

camera interviews of each child. Father's sole custodial period ended on or about June 19, 2024.

At the April 17, 2024 hearing, Dr. Clawar testified that the Children had made "unusual progress socially, emotionally, [and] familiarly [sic]" but there were "some outstanding issues, which would be expected because the [C]hildren really hadn't seen [F]ather in going on three years." N.T., 4/17/2024, at 10, 21. The Children all missed Mother but had started to show some physical affection with Father, especially O.S., and the younger two, D.S. and O.S., started calling him "dad." *Id.* at 12-13, 17. The activity-based reunification included sunset walks, playing games, doing arts and crafts, receiving past birthday and holiday presents that Father had saved for the Children over the years, playing basketball at the playground, practicing dance, preparing and eating meals together, going to the beach, playing football on the beach, walking on the boardwalk, playing at the arcade, and shopping for clothes. *Id.* at 11-12, 15-16. The oldest child, A.S., was unhappy with the custodial arrangement, disengaged at times, and felt the need to oversee her siblings, but her relationship with Father did improve and she started talking to him about her friends, boyfriend, sports, and travel. *Id.* at 13-16, 19, 99. The Children's academic performance declined with the online schooling. *Id.* at 21.

Because reunification was progressing positively, attending Turning Points was put on hold. *Id.* at 24. Dr. Clawar concluded that "see[ing] this

amount of change in 30 days" demonstrated to him that "these children are not afraid of this father." *Id.* at 28. However, this period involved multiple incidents where police were called and/or a report was filed with child protective services, which the trial court detailed in its findings of fact and conclusions of law and is supported by the record.[17] One incident involved the Children attempting to run away at approximately 1:30 a.m. during the first week; a window alarm alerted Father. *See* Findings of Fact and Conclusions of Law, 12/17/2024, at 30-34. Father tackled A.S. outside and held her down until police arrived. *Id.* A.S. complained that she could not breathe and he did not remove himself from her when she asked. *Id.* A second incident occurred on the second day when A.S. refused to relinquish her phone charger to Father. *Id.* at 34-35. A.S. reported that Father pushed her up against a wall and held her arms to retrieve it from her. *Id.* Neither of these incidents resulted in the filing of criminal charges and the investigations by child protective services deemed the reports unfounded. *See id.* at 33, 35. A third incident involved Father accidentally hitting A.S. in her eye with a plastic puck while the two were playing hockey outside.[18] *Id.* at 35-36. Father, a nurse, immediately rendered aid and sought appropriate medical care. *Id.* This incident did not result in criminal charges, and although the parties did not

---

[17] The record is unclear as to who called police or filed reports.

[18] A.S.'s primary extracurricular activity was playing on an ice hockey team.

- 28 -

present evidence of the result of investigation by child protective services, the trial court found "no fault with Father's actions with respect to this incident." *Id.* at 36.

The GAL reported that in her interviews with each child during this period, O.S. was "bubbly" and happy, D.S. covered his face, did not want to talk to her, and started to cry, and A.S. was "animated" and seemed proud of her black eye from the hockey accident with Father. N.T., 4/30/2024, at 47-49. Each child said they missed Mother. *Id.* at 52. During the trial court's interview with each child, A.S. said that she was not "okay" and wanted to "go home," D.S. was doing "okay" and finding school confusing and difficult, and O.S. said things were going "okay" with Father but she missed Mother and her school friends. *See id.* at 90-126. D.S. and O.S. denied receiving any discipline or punishment from Father. N.T., 4/30/2024, at 45, 120, 126.

On April 30, 2024, the trial court held a hearing to address numerous outstanding petitions and motions filed after the trial court's interim order and received testimony from Mother relating to, among other things, her social media use. On May 28, 2024, the parties appeared for a hearing, at which Father and Dr. Clawar testified. Father described his efforts to improve the Children's school performance. N.T., 5/28/2024, at 21-26. Dr. Clawar opined that attending Turning Points would not be successful because of outside influence on the Children. *Id.* at 36. Dr. Clawar's updated report on the Children during the ninety-day period confirmed that they continued to engage

in similar activities with Father. *Id.* at 32. He testified that A.S. displayed a greater reconnection with Father's father and their family memories. *Id.* He noted that during a week where A.S. did not have email access, she was the most socially and emotionally comfortable she had been in her time there, but when her email was restored, her negative behaviors returned. *Id.* at 34. O.S. continued to be the most emotionally open and engaged with Father, whereas D.S. was engaging but quieter and more withdrawn than before. *Id.* at 40. Dr. Clawar testified that Father was making positive efforts for reunification, including engaging in activities, tolerating the Children's negativity, trying not to escalate situations, giving the Children space, connecting them back to their extended family, and entertaining their memories and that he has "pretty much done everything that I think is humanly possible." *Id.* at 54-55, 88. He further discussed ways in which Mother could be more cooperative with reunification, such as removing (or attempting to have others remove) social media posts and sharing a new, positive narrative about Father to the Children and their medical providers, teachers, and coaches. *Id.* at 55-56, 65, 75.

On May 30, 2024, the trial court conducted a remote, in camera interview of each child. A.S. reported that her eye was healing, she liked her new individual therapist, she was not doing her school assignments, and that things with Father were "not terrible." N.T., 5/30/2024, at 13, 15-16, 18. She agreed he welcomed her and was trying, and stated she liked

reconnecting with her cousins. *Id.* at 18, 20. She said she felt safe with her grandparents and "kind of" safe with Father. *Id.* at 22. D.S. reported that he was doing "okay" and getting along with Father and his extended family but continued to struggle with school. *Id.* at 4-5. He denied that there was anything bothering him or making him upset while at Father's house, agreed he was connecting more with Father than before, and the extended family made him feel welcome. *Id.* at 9-11. O.S. reported that she was getting along with her grandparents and "kind of" getting along with Father, saying she did not feel safe with Father because he tackled A.S. when the Children tried to run away. *Id.* at 28.

On May 29, 2024, the trial court issued an order to resume the trial, scheduling it to begin June 24, 2024. In the interim, on June 14, 2024, the trial court issued an amended order reinstating the July 2, 2021 temporary custody order.

The trial proceeded as scheduled on June 24, 2024, at which Mother and Father's mother testified. Mother recounted an incident with Father that occurred after the divorce filing but before he moved out of the marital residence in June 2020. N.T., 6/24/2024, at 142-43. She testified that during a verbal argument with Father, she locked herself in her bedroom because she was scared and upset and called her sister "frantically upset." *Id.* at 143.

She testified that Father was "enraged" and broke down the bedroom door.[19] *Id.* She testified that she quickly ran into the bathroom and locked the door. *Id.*

Mother further testified about an incident during a family trip to Disney World in September 2019, testifying that as they were going through security to enter the park, Father "got into a heated yelling argument" with park personnel over checking each compartment of his bag. *Id.* at 137-38. Mother testified that the personnel threatened to arrest him, but the family, including Father, was allowed entry into the park. *Id.* at 138.

The next day, the trial court continued the remaining scheduled trial dates because Mother's counsel experienced a medical issue. On July 5, 2024, Mother sought a continuance because of witness unavailability and her counsel's teaching duties. The trial court denied the requested continuance and trial resumed on July 11, 2024, at which Mother, Father, and the GAL testified. The GAL reported that

> [w]hile the [C]hildren were with [Father], they expressed a desire to return home but did not state that they were afraid of [Father]. The main concern during [the GAL's] April meeting [with the Children] was the[ir] lack of control [over the custody situation] and their conception that the situation was unfair to [Mother]. Now that the [C]hildren have returned to [Mother,] they are once again stating that they are afraid of [Father].

---

[19] Father later attempted to explain his behavior, testifying that he was worried that Mother might hang herself and "panicked" and "tried to get in that door." N.T., 7/11/2024, at 84-85.

I do not believe any half measures will work in this case as [M]other shows no signs of relenting in her fight to end all visitation for [F]ather and to use the [C]hildren to achieve that end.

N.T., 7/11/2024, Ex. D-17 (GAL Report, July 2024). The GAL stressed that

every single provider has agreed that Mother is sabotaging any possibility of forward motion with the [C]hildren and with Father, and that the [C]hildren are being fed information that's age inappropriate as well as just plain inappropriate. And that is fostering this feeling that they have. And I do think that unfortunately at this point, their feelings are somewhat genuine because it's been put in their heads so much that Father is someone to be afraid of.

*Id.* at 213. The GAL continued to have no concerns about the Children's health and safety while in Father's care. *Id.* at 236. Dr. Clawar echoed this position during his expert testimony. *See id.* at 241-45.

On July 16, 2024, Mother filed a motion seeking the trial court's recusal, which it denied. The trial proceeded again on July 17, 2024, at which Mother's friend, Father, and Dr. Clawar testified. Mother's friend, Mark Myers, testified about an incident with Father in 2017 that happened on a date night with his wife, Mother, and Father. N.T., 7/17/2024, at 22. At a restaurant, Mr. Myers testified that Father "seemed to be talking about a lot of issues" that "kind of appalled" the rest of the group and made them uncomfortable.[20] *Id.* at 23. After dinner, he testified that both couples went to the Myers' home, where Father "chatt[ed]" with him about a pistol that he carried on his ankle. *Id.*

_____

[20] Mr. Myers did not describe the issues.

He testified that when the women left to go upstairs to look at a newly remodeled bathroom, he "joked" that they were just going upstairs to talk about the men. *Id.* Mr. Myers testified that Father's face turned red and he "started screaming about [Mother] talking about him." *Id.* at 24. Mr. Myers testified that he was not expecting that reaction and concerned for their safety, so he ended the evening and Mother and Father left without issue. *Id.* at 24-25. Mr. Myers testified that he discussed the incident with his wife immediately after and they decided to not allow their child to go to Mother and Father's house without Mother present. *Id.* at 25.

The trial court interviewed the Children in camera on July 26, 2024, and the parties made their closing arguments on September 6, 2024.

On December 17, 2024, the trial court entered its final custody order and issued a sixty-eight-page findings of fact and conclusions of law in support thereof.[21] The trial court awarded Mother and Father shared legal custody and Father partial physical custody on a graduated schedule. The trial court detailed Father's partial physical custody in four stages over the course of nearly eight months, with increased custodial time at each successive stage.

In the first stage, the trial court awarded Father time with A.S. every Saturday from 9:00 a.m. to 6:00 p.m. and a weekly Friday dinner visit with

_____

[21] On September 17, 2024, the trial court issued an order extending its time to submit its final order and findings of fact and conclusions of law and stated the delay was the result of the complexity of this matter and the trial court's workload.

the Children from 5:00 p.m. to 7:00 p.m. at a restaurant of his choice. In the second stage, Father's custodial time increased to include an overnight visit with the Children, provided he has his own residence with a separate bed for each child. In this stage, the trial court awarded Father custodial time every other Saturday from 9:00 a.m. to Sunday at 6:00 p.m. and continuation of the weekly Friday dinner visit. In the third stage, Father's custodial time with the Children increased to every other Friday at 6:00 p.m. to Sunday at 6:00 p.m. and a dinner visit every other Wednesday of his non-custodial weekend from 5:00 p.m. to 7:00 p.m. In the final stage, which coincided with the start of the school year, Father's custodial time increased to every other Thursday at 6:00 p.m. to Monday morning at school drop-off, provided Father had his own residence with three bedrooms within a twenty-minute drive to the Children's schools, and a dinner visit every other Wednesday of his non-custodial weekend from 5:00 p.m. to 7:00 p.m. The trial court also detailed the parties' custodial time during summers, holidays, and vacations.

Among other things, the trial court prohibited the parties from disparaging each other within earshot of the Children or by public display; discussing their marriage history and custody and divorce litigation with the Children, except if invited by their mental health provider or to explain that they must comply with the final custody order; and posting any information relating to the custody litigation on social media. Finding the mental health difficulties of the two younger children, D.S. and O.S., attributable to this

prolonged dispute and Mother's alienating behaviors, the trial court ordered them to receive mental health treatment before Father could exercise his physical custody of them. Should a child fail to enter Father's vehicle for a custody exchange, the trial court ordered that child to be precluded from participating in any extracurricular or social activities for that day. Based on Mother's ability to secure the Children's obedience and cooperation in all other aspects of their lives, the trial court required her to ensure the Children enter Father's vehicle or she would be subject to contempt proceedings.

In its analysis, the trial court began by recognizing that "[i]n a custody case, the [trial c]ourt concerns itself with the best interests of the child." Findings of Fact and Conclusions of Law, 12/17/2024, at 24. It observed that the law specifies the factors it must consider in determining their best interests, "giving substantial weighted consideration" to the factors specified under paragraphs (1), (2), (2.1), and (2.2) which affect the safety of the child. *Id.* (emphasis omitted) (quoting 23 Pa.C.S. § 5328(a)).[22] The trial court

_____

[22] Section 5328(a) provides that "[i]n ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving substantial weighted consideration to the factors specified under paragraphs (1), (2), (2.1) and (2.2) which affect the safety of the child[.]" 23 Pa.C.S. § 5328(a). At the time of the proceedings below, the factors included:

(1) Which party is more likely to ensure the safety of the child.

(2) The present and past abuse committed by a party or member of the party's household, which may include past or current

*(Footnote Continued Next Page)*

_____

protection from abuse or sexual violence protection orders where there has been a finding of abuse.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(2.2) Violent or assaultive behavior committed by a party.

(2.3) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party if contact is consistent with the safety needs of the child.

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life, except if changes are necessary to protect the safety of the child or a party.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's developmental stage, maturity and judgment.

(8) The attempts of a party to turn the child against the other party, except in cases of abuse where reasonable safety measures are necessary to protect the safety of the child. A party's reasonable concerns for the safety of the child and the party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party. A child's deficient or negative relationship with a party shall not be presumed to be caused by the other party.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

*(Footnote Continued Next Page)*

elaborated as to the weight it assigned to each factor and in whose favor it weighed. The trial court found the majority of factors to be neutral.[23] It found factors (3), (5), and (12) favored Mother while factors (1), (7), (8), and (13) favored Father and factor (2.3) strongly favored Father. *Id.* at 24-65.

This timely-filed appeal followed. Mother raises the following issues for our review:

_____

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child or self from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

*Id.* (effective August 13, 2024 to August 28, 2025).

[23] The trial court found factors (2), (2.1), (2.2), (4), (6), (10), (11), (14), and (15) to be neutral. Findings of Fact and Conclusions of Law, 12/17/2024, at 24-65. It found factor (9) to be negative for both Mother and Father. *Id.* at 59.

1.  Did the trial court make an error of law and abuse its discretion by entering an order for custody where the [trial] court's decision is manifestly unreasonable, unsupported by the record, and influenced by bias?

2.  Did the trial court make an error o[f] law and abuse its discretion by entering a custody order when [the trial] court's decision misapplied the law by not factoring in and following Kayden's Law, 23 Pa.C.S.[] § 5328[24]?

Mother's Brief at 17.

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*Wilson v. Smyers*, 284 A.3d 509, 515 (Pa. Super. 2022) (citation and quotation marks omitted).

In her first issue, Mother raises a number of issues pertaining to the trial court's custody order and alleged bias in rendering its decision. She claims

___

[24] In 2024, the General Assembly enacted amendments to the custody factors "pursuant to Act of April 15, 2024, P.L. 24, No. 8 (known as 'Kayden's Law')[.]" *Velasquez v. Miranda*, 321 A.3d 876, 886 n.6 (Pa. 2024). "Kayden's Law expand[ed] the factors to be considered in the custody court's best interest analysis" and "requires the court to give 'substantial weighted consideration' to, inter alia, the 'safety of the child[.]'" *Id*. (citation omitted). The amendments became effective on August 13, 2024. Because the trial court here entered the final custody order in December 2024, Kayden's Law applies.

bias and the appearance of impropriety by the trial court with its final custody order, behavior toward Mother and her counsel, and "refusal to uphold the law when the law favored Mother," and hold a hearing on Mother's recusal motion. *Id.* at 42. She asserts that the trial court should have recused itself based on statements it made to her counsel about requiring formality in emails[25] and failing to file motions with verifications;[26] rushing the custody trial to finish

_____

[25] It is unclear from the record exactly what transpired regarding counsel's emails and Mother's brief merely cites to her motion to recuse (which does not cite to the record). *See* Mother's Brief at 47. From what we can discern, it appears the trial court took issue with Mother's counsel signing his emails with only his first name above the signature line. Before the start of trial on July 17 2024, the trial court stated:

> I have reviewed [Mother's] motion to recuse, and I want to say that apparently, I was in error in correcting [Mother's counsel] in signing his emails as Joe. Apparently, [Father's counsel] does the same thing. I do not appreciate this level of informality with my assistance [sic]. I find it inappropriate. I believe I went on and on and on about us not all being friends. The professional distance between the attorneys and my secretaries is important to maintain, to preserve the impartiality and fairness of the Court. So, [Mother's counsel], when I corrected you, I apologized. I don't see those emails and if it is going on with respect to other attorneys who practice in front of me, I will be drafting, or my clerk will be drafting – my clerk over there will be drafting a form email to ask attorneys not to address the Court staff so informally.

N.T., 7/17/2024, at 4-5. Relatedly, we note with disapproval that in her brief, Mother mischaracterized the trial court's statements by failing to quote them in their entirety. *See* Mother's Brief at 48.

[26] During Father's counsel's examination of Mother at the April 30, 2024 hearing about what she pled in her emergency petition for custody, the trial court remarked, "There's no verification attached to that petition in violation of procedural rules," and explained the typical verification process. N.T.,
*(Footnote Continued Next Page)*

before the effective date of Kayden's Law and refusing to grant a two-hour

continuance for Mother's counsel's teaching duties;[27] and chastising and

_____

4/30/2024, at 83-84.  Later in the proceedings, the trial court questioned Mother's counsel as to why the petition did not contain a verification, to which he responded that he believed it was required for pleadings but not motions. *Id.* at 110.  Father's counsel recounted that earlier in the litigation, Mother's prior counsel cited him for failing to include a verification for Father's emergency petition for custody, which he rectified immediately.  *Id.*  The trial court took the matter under advisement.  *Id.*  Subsequently, it denied Mother's emergency petition except as to the Children's poor performance in their online school.  *See* Order Denying in Part and Granting in Part Plaintiff's Emergency Petition for Custody and Denial of Defendant's Counterclaim Request for Attorney's Fees and Sanctions, 5/14/2024, ¶ 65.

[27] During the April 30, 2024 hearing on several of the parties' motions and petitions, the trial court remarked that Mother's emergency petition for custody referenced Kayden's Law, which was not then in effect. N.T., 4/30/2024, at 39.  It noted the law's effective date in August 2024 and stated that it may look to the law for guidance as appropriate.  *Id.*  During the trial on June 24, 2024, the trial court commented that it was "going to try to get this [final custody decision] out before" the effective date of Kayden's Law. N.T., 6/24/2024, at 38.  In addressing Mother's recusal motion, the trial court stated:

> [T]he [trial c]ourt finds that there is no basis of fact or law that would warrant my recusal at this time.  That being said, I do want to note that this case has been rife with zealous advocacy both [by Mother's prior and current counsel.]  I encourage and invite zealous advocacy and I congratulate you both for hanging in here. This has been a very, very difficult case.  However, I do want to just emphasize that my push to finish this case has to do with the number of years that it's been pending.  I do believe that justice delayed is justice denied, and that this case needs to come to a conclusion so that the parties can move on.

N.T., 7/17/2024, at 5-6.  As discussed below, the trial court entered its final order after Kayden's Law took effect and it undertook a thorough analysis of the custody factors, including those newly enacted under Kayden's Law.

threatening to report her counsel for failing to designate a successor attorney in the event of his death or disability.[28] *Id.* at 47.

Mother also faults the trial court in finding that Mother alienated the Children. *Id.* at 44. She acknowledges the trial court's alienation finding was supported by Dr. Mesiarik's custody evaluation report and testimony but argues that the trial court should not have credited it. *See id.* at 44-45. Mother contends that even though the trial court held Father responsible for the Children's safety during his ninety-day custodial period, Father failed to do so. *Id.* at 45. She points to Father's restraint of A.S. when the Children attempted to run away, the incident with the phone chargers, and A.S.'s eye injury while playing hockey with Father. *Id.* at 45. Further, Mother claims that the trial court failed to hold Father accountable in ensuring the Children's health and education during his custodial time. *Id.* at 46-47.

Mother contends that the final custody order was "impossible to follow" because the stated dates for Father's stages of visitation had already passed

_____

[28] Regarding the designation of a successor attorney, the record is again unclear but it appears to stem from Mother's counsel's earlier failure to appear because of a medical issue. The trial court stated:

> And I did speak to [Mother's counsel] about his lack of communication with the [trial c]ourt, not only on one occasion, but on two occasions. But that being said and cited for comment to [] disciplinary rules of professional conduct 1.3, paragraph five, and expected that it would not – that situation would not recur.

N.T., 7/17/2024, at 5; *see also* Rules of Professional Conduct § 1.3 Comment (5).

and depended on whether he had suitable housing. *Id.* at 48. She asserts that it improperly set "hard dates" for increased visitation instead of allowing the Children's therapist to make that determination and it named a therapist without determining whether the Children's insurance would be accepted. *Id.*

In addition, Mother takes issue with the trial court's findings and credibility determinations regarding Father's anger and outbursts relating to the incidents involving Father at Disney World, kicking down the bedroom door in the marital residence, and the social outing with Mother, Father, Mr. Myers and his wife. *See id.* at 49-52. In her view, the trial court should have credited this testimony that was favorable to her. *See id.*

In our thorough review of the voluminous record, including more than 2,300 pages of notes of testimony from the extensive hearings in this matter, we are unable to locate any record support whatsoever to lend credence to Mother's claim of trial court bias or the appearance of impropriety. To the contrary, the record reveals that throughout the life of this case, the trial court was exceedingly prepared, asked relevant questions, repeatedly reiterated that it was focused upon the Children's best interests, treated the parties and their counsel fairly and respectfully, and maintained order and decorum even in the face of direct and personal social media attacks concerning its performance and decisions in this case.

The trial court not only presided over nine days of trial but also ruled on countless petitions and motions, including emergency filings, which regularly

required additional hearings. The trial court interacted with the parties frequently, as reflected by the multiple temporary and interim custody orders it entered throughout the proceedings. There can be no doubt that the trial court was extremely familiar with the parties, the Children, the witnesses, and the experts who offered testimony and reports to inform the trial court in determining the custodial arrangement that is in the Children's best interests. That Mother is dissatisfied with the trial court's final order does not equate to trial court bias or the appearance of impropriety. *See Lewis v. Lewis*, 234 A.3d 706, 722 (Pa. Super. 2020) (stating that "simply because a judge rules against a party does not establish bias on the part of the judge against that party") (citation, quotation marks, and brackets omitted). Rather, as our very lengthy recitation of the facts of record in this matter reflects, the trial court's findings are supported by competent evidence of record and its conclusions are reasonable as shown by record evidence. *See Wilson*, 284 A.3d at 515. Further, we must defer to the trial court's determinations as to the credibility of the witnesses and evidence presented and the weight to be afforded thereto as it viewed and assessed the parties and witnesses firsthand over the span of several years. *See id.* Mother's first issue merits no relief.

In her second issue, Mother contends that the trial court "misapplied the law by not factoring in and following Kayden's Law." Mother's Brief at 53. She claims that the trial court "downplayed" two incidents involving Father, which she argues recklessly caused injury to another: A.S.'s eye injury while

playing hockey with Father and Father striking Mother in the face after she spat on him at the ice rink. *Id.* at 55. She also asserts that Father's filing of multiple emergency petitions and contempt motions was litigation abuse, which she argues also falls under Kayden's Law. *Id.* at 55-56.

Mother's claim is rooted in her contention that the Children are unsafe with Father. Over the span of more than forty pages, the trial court carefully, thoroughly, and methodically analyzed each of the subsection 5328(a) factors, including giving substantial weighted consideration to the Kayden's Law factors specified under paragraphs (1), (2), (2.1), and (2.2), to arrive at its legal conclusions. *See* Findings of Fact and Conclusions of Law, 12/17/2024, at 23-65. With respect to A.S.'s eye injury, the trial court analyzed it under factor (1) as follows:

> [A]nother Child[L]ine report was filed as a result of an injury suffered by A.S. when she and Father were playing hockey, also at Cape May…. They were playing with a hard plastic puck. [Father's mother] reported that they were playing at the playground. Each was taking a turn hitting the puck into the net. A.S. was on the side of the net and moved into Father's line of fire. [The puck Father shot] hit her near her eye.
>
> Immediately, she was bleeding and screaming. Father, a nurse, rendered aid. He then brought her to the nearest urgent care center where [healthcare providers] administered treatment and stitched the wound. Father and A.S. then were directed to the emergency room at Cape May Regional Hospital for a CT scan and any other necessary studies. Father later took A.S. to a plastic surgeon and an ophthalmologist.
>
> When the [trial c]ourt interviewed A.S. on May 30, 2024, via Microsoft Teams, she reported that her eye failed to hurt her at all even though the doctors determined that she suffered an orbital fracture. The scar looked like it was healing and A.S. was

- 45 -

smiling – the [trial c]ourt remarked that it had never seen her smile like that. She seemed to harbor no ill will towards Father due to the accident.

About two months later, on July 26, 2024, when the [trial c]ourt interviewed A.S. in person, the scar was barely visible except that part of her eyebrow was missing. A.S. indicated that it would grow back. She seem[ed] to feel that this injury was almost a badge of honor in hockey.

At the time that the [trial c]ourt concluded the trial, no evidence was presented regarding the final outcome of that [] Child[L]ine [r]eport. However, it is difficult to imagine that child protective services would deem this report founded. Father was playing hockey with A.S., a sport that she clearly loves. A.S. moved so that Father accidentally hit her in the eye. He rendered aid immediately and took her to multiple medical facilities to ensure that her medical needs were met. Her appearance a short time after the incident on April 30, 2024[,] and lack of concern about the accident demonstrates that she considered this an accident as well.

Regarding whether Father was negligent, the [trial c]ourt finds that this accident could have happened to any parent playing a sport with a ball or puck that could injure a child: basketball, hardball baseball, tennis or lacrosse. The evidence of record clearly demonstrates that this was an accident and Father was not negligent. In addition, the [trial c]ourt finds that Father ensured that A.S. received appropriate emergency and follow-up care. Accordingly, the [trial c]ourt finds no fault with Father's actions with respect to this incident.

Findings of Fact and Conclusions of Law, 12/17/2024, at 35-36. The trial court continued its factor (1) analysis, concluding that it

has observed Father's demeanor for the past three years during these arduous and difficult proceedings. Mother and witnesses have pursued Child[L]ine reports and allegations of violence that [] Father has emphatically denied. … Mother, Maternal Grandmother[,] and others have subjected Father to social media attacks. The trial alone lasted nine days as well as additional court proceedings lasting hours.

Despite these attacks outside of [the trial c]ourt as well as during these proceedings, the [trial c]ourt never witnessed a glimmer of anger on Father's part. Rather, on multiple occasions, the [trial c]ourt has seen Father's tears and sadness at the loss of his children. The [trial c]ourt's observations of Father's demeanor supports the [trial c]ourt's conclusion that Mother's allegations [of abuse by Father] lack merit.

In conclusion, the [trial c]ourt finds that Mother's allegations that the [C]hildren are not safe in Father's care are not supported by the record. None of these incidents of alleged abuse demonstrate Father's manifesting the "rage" that she claims endangers her and [the C]hildren. Moreover, the series of Child[L]ine [r]eport[s,] save the [lack of record evidence of] the hockey incident [report's outcome,] were deemed unfounded. No credible evidence of abuse has been presented. Accordingly, the [trial c]ourt concludes that Mother's allegations that Father abused the [C]hildren are not supported by the record.

*Id.* at 36-37.

Regarding the May 2021 ice rink incident, the trial court analyzed it under factor (2) as follows:

[Mother] has maintained throughout this litigation that Father committed an act of domestic abuse against her in May 2021, in front of the [C]hildren, at IceWorks in Ashton[, Pennsylvania]. The credible evidence of record demonstrates that the following occurred.

On Sunday, on or about May 23, 2021, Father was enjoying his custodial time with the [C]hildren. He was at D.S.'s baseball game with [his other children]. After the game, he told Mother that D.S. was faint and needed some water.

Father credibly testified that Mother started calling Father a "scumbag," and chastised him for "doing what he did," apparently referring to having introduced the [C]hildren to his girlfriend. She continued to yell at him.

He was able to hustle the [C]hildren into the car but O.S. still had ice hockey practice. As the locker rooms [were] still closed due to the Covid[-]19 pandemic, he dressed O.S. in the car

- 47 -

and she went on the ice. Mother was on one side of the bleachers while Father located himself on the opposite end.

Although there was plenty of room in the bleachers near Father and near Mother, Maternal Grandmother sat behind Father and put her feet on his bleachers on Father's back. Nevertheless, he ignored her.

Subsequently, O.S. completed her hockey session. Father credibly testified that Mother confronted him again, calling him a "scumbag" and yelling "you're not allowed to do what you did." He hastened to exit the hockey rink out to the car with O.S. in his arms. He buckled D.S., then [nine] years old, into his booster seat and O.S. into her car seat. A.S. was not yet secured. The two younger children, secured in their safety seats, had no view of the back of the car. The eldest[, A.S.,] may have been able to see.

When the [C]hildren were seated in the car and their belongings loaded into his truck, [Father] turned to confront Mother and recounted what he said to her:

> ['Y]ou are the one being a scumbag[']. And then she leans back and spits in my face. And out of reaction, I pushed her with my left hand. And then it went – then [Mother] yelled, then it was – then [A.S.] got out of the car, I grabbed [A.S.] under my right arm[…].

[N.T.,] 7/11/[20]24, at 95.

Thus, Mother escalated the verbal altercation by spitting in Father's face. However, the parties' testimony conflicts at this point. While Father claims he pushed her, Mother claims that Father punched her.

Whether he punched her or pushed her in the face, Father's actions injured her; her nose started to bleed and her eye started to blacken.

Police were summoned. Mother or Maternal Grandmother shouted that Father had firearms but he showed the police that he was unarmed. The police brought the [C]hildren to Mother to show the[m] that she was fine. Father allowed the [C]hildren to remain with Mother for a long time.

Mother called her best friend, P.M., who enlisted her husband, M.M.[,] to take her to the hospital. M.M. testified that he took Mother to Riddle Hospital[,] where she received a CAT scan. Mother complained of dizziness and a headache. However, the record fails to reveal that she sought additional treatment.

Both Mother and Father filed [PFA p]etitions: Mother on May 25, 2021, CV 2021-080811, and Father, on May 27, 2021, CV 2021-080835. On June 3, 2021, the parties entered into a six[-]month continuance as a cooling off period. Both petitions were dismissed on December 2, 2021.

Mother argues that the [trial c]ourt should strongly consider Father's physical aggression and weigh it heavily against him. She claims that Father seriously hurt her and therefore any physical custody should be supervised.

At the outset, reviewing both part[ies]' testimonies, the [trial c]ourt was struck by Mother's focus on Father's actions, and her failure to mention that she was not blameless: she had incited his response by spitting in his face.

Moreover, in May 2021, many people still wore face masks to guard against Covid-19 infections. The United States remained in the throes of a Covid[-]19 pandemic. Mitigation [sic] had only begun to be mitigated due to vaccine distribution. Therefore, spitting in someone's face could be considered a source of infection for Covid[-]19 and still a health risk.[29]

_____

[29] In her reply brief, Mother argues for the first time that the trial court "elevated" facts by relying on a news report outside the record to support its finding that in May 2021, spitting in someone's face could be considered a source of infection for Covid-19 and a health risk. Mother's Reply Brief at 3. As our Supreme Court has explained:

The opportunity for, and the extent of, a reply brief is limited. The Pennsylvania Rules of Appellate Procedure make clear that an "appellant may file a brief in reply to matters raised by [the] appellee's brief not previously raised in appellant's brief." Pa.R.A.P. 2113(a). Thus, an appellant is prohibited from raising new issues in a reply brief. Moreover, a reply brief cannot be a

*(Footnote Continued Next Page)*

Both parties ardently believe their account and steadfastly defend it. It remains difficult to resolve the conflict of fact as to whether Father hit her with a closed fist or an open hand. However, no dispute exists as to Mother's injuries – she suffered a black eye and a nose bleed.

Based on the evidence of record and reasonable inferences thereon, nevertheless, the [trial c]ourt finds by a preponderance of the evidence that Father failed to intentionally hurt Mother for the following reasons.

At the time of the May 2021 incident, Father testified that he weighed 220 pounds and [was] about 5'8" tall. He was a former weight lifter and trainer. A reasonable inference from the record is that Father was and remains quite strong.

Consequently, had he intended to hurt [Mother], her injuries would have been much greater: perhaps a face fracture. She might have ended up on the pavement with a head injury. None of those injuries occurred. Accordingly, it is unlikely that he pushed or hit her with an intention to inflict harm. Instead, it is likely that upon [Mother's] spitting in his face, he was acting defensively to avoid further saliva contact.

Moreover, Mother never accepted any blame in commencing the course of events that resulted in the parties' mutual assault or striking the first blow by spitting in Father's face. At D.S.'s baseball game, Mother relentlessly harangued Father about his girlfriend and introducing his girlfriend to the [C]hildren. Father is not blameless – perhaps he should not have introduced the [C]hildren to his girlfriend. However, Mother was also wrong by litigating this issue in front of the [C]hildren's sports community,

_____

vehicle to argue issues raised but inadequately developed in appellant's original brief. When an appellant uses a reply brief to raise new issues or remedy deficient discussions in an initial brief, the appellate court may suppress the non-complying portions.

***Riverview Carpet & Flooring, Inc. v. Presbyterian SeniorCare***, 299 A.3d 937, 969 n.20 (Pa. Super. 2023) (quoting ***Commonwealth v. Fahy***, 737 A.2d 214, 218 n.8 (Pa. 1999)). We therefore do not consider this new claim on appeal.

the [C]hildren's team members, and most importantly, [the C]hildren.  Thus, neither party behaved correctly here.

Moreover, Father should have walked [away] from Mother's verbal assaults and taken the [C]hildren – it was his period of physical custody.  By engaging her, he ran the risk of escalating Mother's verbal altercation.  Indeed, Mother likely was injured because any physical contact by Father risked injury due to his much greater weight and height.  In sum, both [Mother and Father] behaved abominably in front of their [C]hildren.

Based on this analysis, the [trial c]ourt concludes this factor is neutral.

*Id.* at 47-51 (footnotes and some citations omitted).

Accordingly, Mother's contention that the trial court failed to analyze the custody factors under Kayden's Law is without merit.  In addition, as stated above, we must defer to the trial court's credibility and weight determinations. *See Wilson*, 284 A.3d at 515.  We further find no support in the record for Mother's allegation that Father's filings throughout the proceedings below rose to the level of litigation abuse.  The record reflects that Father appropriately sought to protect and enforce his custodial time with the Children.  We note that Mother, too, has filed numerous petitions and motions in this matter.  Accordingly, Mother's second issue is without merit.

Upon our thorough review of the extensive record in this case, we conclude that the trial court's decision is supported by competent evidence of record.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>10/10/2025</u>